UNSEALED AS OF 1/16/08

ORIGINAL  ~~ORDERED SEALED BY COURT~~

FILED

08 JAN 16 AM 11: 40

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

PDZ        DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | No.   '08 MJ 0132 |
| Plaintiff, ) | COMPLAINT FOR VIOLATION OF |
| v. ) | Title 21, U.S.C., Sec. 846, 841(a)(1) — Conspiracy to Distribute Cocaine Base in the Form of Crack Cocaine; Title 21, U.S.C., Sec. 846, 841(a)(1) — Conspiracy to Distribute Methamphetamine |

LEE VAUGHN WALKER (1),
    aka "Lee Dog",
MELVIN ALEXANDER (2),
JOSE GALVAN RICO (3),
    aka "Mija",
ELEODORO CASTILLO (4),
    aka "Onko",
DAPHNE ROSALINDA JACKSON (5),
    aka Daphne R. Rae,
BERNAL ANTHONY MITCHELL (6),
    aka "Tony",
ALLEN MATTHEW BAKER Jr. (7),
    aka "J.R.", aka Tracy Reyard Diggs,
    aka Marcus Johnson,
MICHAEL DWAYNE TRYALS (8),
    aka "Texas Mike", aka Michael Tryls,
    aka Dave Brooks, aka Leon Howard
    Blair, aka Earl David Hollis,
BOBBY SHAWN LOCKHART (9),
    aka "Blue",
ALEXANDER WEIR IV (10),
    aka "Brick",
ALEXANDER WEIR V (11),
    aka "Lil' Brick",
FELIPE MEDINA (12),
MELVIN ANDRE BIBBS (13),
MARK EDWARD RUNNELS (14),
    aka "Marky Mark",

                Defendants.

The complainant, being duly sworn, states that:

2

### Count 1

Beginning on a date unknown and continuing up to the filing date of this complaint, within the Southern District of California and elsewhere, defendants LEE VAUGHN WALKER, aka "Lee Dog", MELVIN ALEXANDER, JOSE GALVAN RICO, aka "Mija", ELEODORO CASTILLO, aka "Onko", DAPHNE ROSALINDA JACKSON, aka Daphne R. Rae, BERNAL ANTHONY MITCHELL, aka "Tony", ALLEN MATTHEW BAKER Jr., aka "J.R.", aka Tracy Reyard Diggs, aka Marcus Johnson, MICHAEL DWAYNE TRYALS, aka "Texas Mike", aka Michael Tryls, aka Dave Brooks, aka Leon Howard Blair, aka Earl David Hollis, BOBBY SHAWN LOCKHART, aka "Blue", ALEXANDER WEIR IV, aka "Brick", ALEXANDER WEIR V, aka "Lil' Brick", FELIPE MEDINA, MELVIN ANDRE BIBBS, and MARK EDWARD RUNNELS, did knowingly and intentionally conspire with each other and others known and unknown to distribute 50 grams and more of a mixture and substance containing a detectable amount of cocaine base in the form of crack cocaine, a Schedule II Controlled Substance; in violation of 21 U.S.C. §§ 846, 841(a)(1).

### Count 2

Beginning on a date unknown and continuing up to the filing date of this complaint, within the Southern District of California and elsewhere, defendants LEE VAUGHN WALKER, aka "Lee Dog", MELVIN ALEXANDER, DAPHNE ROSALINDA JACKSON, aka Daphne R. Rae, BERNAL ANTHONY MITCHELL, aka "Tony", BOBBY SHAWN LOCKHART, aka "Blue", ALEXANDER WEIR IV, aka "Brick", and MARK EDWARD RUNNELS, did knowingly and intentionally conspire with each other and others known and unknown to distribute 500 grams and more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II Controlled Substance; in violation of 21 U.S.C. §§ 846, 841(a)(1).

This complaint is based on the attached affidavit, which is incorporated herein by reference.

ROBERT A. HARRIS
Special Agent, Federal Bureau of Investigation

SUBSCRIBED and SWORN to before me on January 15, 2008.

Hon. NITA L. STORMES
United States Magistrate Judge

1

2

3                                                **AFFIDAVIT**

4

5        I, ROBERT A. HARRIS, Special Agent, Federal Bureau of Investigation ("FBI"), United

6 States Department of Justice, being duly sworn, state as follows:

7     **A.     EXPERIENCE AND TRAINING**

8            1.      I am a "law enforcement officer of the United States" within the meaning of

9 Title 18, United States Code ("U.S.C."), § 2510(7), who is empowered by law to conduct

10 investigations of, and to make arrests for, offenses enumerated in Title 18, U.S.C. § 2516. I am a

11 duly appointed Special Agent of the FBI and have been employed as such since August 1996. Since

12 June 2006, I have been assigned to the San Diego Violent Crimes Task Force—Gang Group, a multi-

13 agency task force composed of federal, state and local law enforcement personnel tasked with

14 investigating criminal gang enterprises and related criminal activities occurring in the Southern

15 District of California and elsewhere.   Prior to my current assignment, during a period from

16 approximately March 2002 through November 2005, I was assigned to investigate violent gangs and

17 criminal enterprises in the Central District of California and then in the Southern District of

18 California as of December 2005.

19            2.      In December of 1996, I completed Special Agent's training at the FBI

20 Academy in Quantico, Virginia.   The training included instruction in conducting investigations of

21 violations of federal statutes, to specifically include Titles 18 and 21 of the United States Code.

22 Since completing initial training at the FBI Academy, I have received specialized training from the

23 FBI in conducting Criminal Enterprise investigations.   Additionally, I have attended numerous gang

24 investigation-related training administered by other law enforcement agencies and related

25 professional organizations. I have gained experience investigating criminal organizations engaged in

26 conspiracies to manufacture and/or possess with the intent to distribute controlled substances,

27 including marijuana, methamphetamine, and cocaine base.

28            3.      I have directed and/or participated in a number of drug trafficking

investigations conducted by the FBI and other law enforcement agencies, which resulted in the arrest

of numerous subjects and the seizure of controlled substances.   On numerous occasions, I have

interviewed defendants in gang investigations and convicted drug traffickers who agreed to

1  cooperate with government officials.   I have also reviewed numerous records of interviews

2  conducted by other investigators.   I have also directed, supervised or participated in numerous

3  searches of residences of suspected drug traffickers for controlled substances and other evidence of

4  drug trafficking.   I have had discussions with other FBI and Drug Enforcement Administration

5  ("DEA") agents, as well as other narcotics investigators, who have advised me concerning the

6  substance of their similar experiences and the results of their own investigations and interviews.   As

7  a result of my training and experience, and interactions with other experienced Special Agents, Task

8  Force Agents/Officers, and other investigators, I have become knowledgeable about the distribution

9  and trafficking methods employed by drug traffickers, to safeguard, store, transport and distribute

10 drugs, and to collect and conceal drug-related proceeds.   I have also become versed in the methods

11 employed by gang members engaged in drug trafficking to communicate with other participants to

12 accomplish the aforementioned objectives.   (Henceforth, references to "agents" or "officers" refers to

13 both federal agents and local law enforcement officers working with them, unless otherwise

14 specified.).

15         4.      I have become knowledgeable in the methods and modes of narcotics

16 operations, and the language and patterns of drug trafficking.  I am aware of techniques that are often

17 used to attempt to detect and/or hinder law enforcement investigations of gang members engaged in

18 drug trafficking, including: the utilization of multiple cellular telephones; the use of digital and/or

19 text pagers; the employment of counter-surveillance equipment and techniques; the use of false

20 and/or fictitious identities; and the use of coded communications and conversations.

21         5.      My experience as a Special Agent with the FBI, my participation in the

22 investigation of narcotic organizations, my conversations with other Special Agents familiar with

23 narcotic trafficking and money laundering matters, and my training form the basis of the opinions

24 and conclusions set forth below, which I drew from the facts set forth herein.   From my training and

25 experience and the training and experience of other Special Agents, I have learned the following:

26         a.      Individuals involved in drug trafficking often maintain the following

27 items in their residences: controlled substances and paraphernalia for packaging, weighing, cutting,

28 testing, distributing and manufacturing controlled substances.

b.      Individuals involved in drug trafficking often maintain records of their narcotics transactions and other records of evidentiary value for months or years at a time.  It is common, for example, for drug traffickers to keep pay/owe sheets or other papers of drugs sold and monies owed.  Such pay/owe sheets or papers are used as a basis for accounting and for settling existing debts.  Such records are often maintained for a substantial period of time even after the debts are collected.  I have found in my training and experience that such records are invaluable to drug traffickers and that such records are rarely discarded.  Finally, it has also been my experience that such records and pay/owe sheets also frequently include the names, identities and telephone numbers of suppliers, customers and co-conspirators.

c.      Individuals involved in drug trafficking must often rely on others to obtain their drugs and to help them market the drugs.  Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residence.

d.      Individuals involved in drug trafficking commonly earn income in the form of cash and try to legitimize these profits.  In order to do this, traffickers frequently attempt to secrete, transfer and conceal the money by means, including, but not limited to: placing assets in names other than their own to avoid detection while maintaining control; laundering the money through what appears to be legitimate business or businesses; hiding money in their homes, safes and safety deposit boxes; or using the money to buy assets which are difficult to trace.  Records of the these and other types of transactions are often found at the residences of individuals involved in drug trafficking.

e.      Individuals involved in drug trafficking often keep and maintain large amounts of United States currency at their residences.  Such funds are often used for every day expenditures and to maintain and finance their ongoing drug business.  Additionally, individuals involved in drug trafficking often amass and maintain assets at their residence which were generated by their trafficking activities, or purchased with the cash earned from such trafficking.

f.      Individuals involved in drug trafficking often maintain weapons, firearms and ammunition on their person or in their residence and/or vehicles.  Such weapons and firearms are used, and can be used, as an instrumentality of the crime of possession and distribution

3

1  of drugs. Furthermore, I am aware of instances in which traffickers have maintained such items in

2  their residences and vehicles in order to protect themselves and guard their drugs and drug profits, as

3  well as for enforcement purposes during their drug dealings.

4        g.    Residences and premises used by individuals involved in drug

5  trafficking usually contain articles of personal property evidencing the identity of person(s)

6  occupying, possessing, residing in, owning, frequenting or controlling the residence and premises.

7        h.    Individuals involved in drug trafficking frequently communicate with

8  co-conspirators by means of cellular telephones and electronic paging devices and usually maintain

9  these items on their person and/or in their residences and vehicles.

10        i.    Individuals involved in drug trafficking often utilize radio scanners,

11  police radios and other electronic equipment in order to conduct counter-surveillance upon law

12  enforcement authorities, and usually maintain these items on their person and/or in their residences

13  and vehicles.

14        j.    Individuals involved in drug trafficking often maintain photographs,

15  and/or audio and video recordings of their associates or real and personal property which were

16  acquired with drug proceeds or property utilized to facilitate drug trafficking activities. Such items

17  are typically maintained in their residences.

18        k.    Drug traffickers often store information relating to their drug

19  trafficking business on computers and/or computer disks.

20        6.    This affidavit supports (1) a criminal complaint, and (2) applications for

21  warrants to search and seize evidence from the premises described below.

22     **B.**    **LOCATIONS TO BE SEARCHED**

23        7.    I submit that the facts contained in the numbered paragraphs below are

24  accurate, and that they demonstrate that there is probable cause to believe that documents and

25  records and other instrumentalities and evidence of violations of Title 21, United States Code,

26  Sections 841(a)(1) and 846, and Title 18, United States Code, Sections 2 and 1956(h), will be found

27  at the residence (and all surrounding areas, including garage, outbuildings, enclosures, vehicles,

28  containers, and safes) for the individuals and locations specified below. These locations are more

particularly described in **Attachment A** to the applicable search warrant, which is incorporated

4

1  herein by reference. I specifically believe that there is probable cause to believe the residence in

2  Attachment A is likely to contain documents associated with the listed individual and any and all

3  co-conspirators referenced herein. The properties to be searched, along with the relevant owners,

4  tenants or residents, are as follows:

5          a.     Lee Vaughn WALKER, aka "Lee Dog", and Virginia Hughes; **7410**

6  **Cuvier Street, Apartment 4, La Jolla, California;**

7          b.     Gloria JACKSON; **7163 Central Avenue, Lemon Grove, California;**

8          c.     Alexander WEIR V, aka "Lil' Brick"; **9928 Buena Vista, Spring**

9  **Valley, California;**

10          d.     Melvin ALEXANDER; **6225 Stanley Avenue, Apartment 1, San**

11  **Diego, California 92120;**

12          e.     Lee Vaughn WALKER, aka "Lee Dog", and Bernal Anthony

13  MITCHELL, aka "Tony"; **4881 Rolando Court, Apartment 69, San Diego, California 92120;**

14          f.     Eleodoro CASTILLO, aka "Onko"; **4770 Home Avenue, Apartment**

15  **301, San Diego, California;**

16          g.     Jose Galvan RICO, aka "Mija"; **3670 Highland Avenue, San Diego,**

17  **California 92105;**

18          h.     Melvin Andre BIBBS; **4068 44th Street, Apartment 104, San Diego,**

19  **California 92105;**

20          i.     Keiko Thomas and Michael Dwayne TRYALS, aka "Texas Mike", aka

21  Michael Tryls, aka Dave Brooks, aka Leon Howard Blair, aka Earl David Hollis; **4147 43rd Street,**

22  **Apartment A, San Diego, California 92105;**

23          j.     Alexander WEIR IV, aka "Brick"; **745 42nd Street, San Diego,**

24  **California 92102;** and

25          k.     Niesha Shawnee ARMSTRONG, aka Niesha S. Jackson; **4172 Yale**

26  **Avenue, La Mesa, California.**

27  //

28  //

5

C.    **PROPERTY OR ITEMS TO BE SEIZED**

8.    I request permission to search and seize documents and all other instrumentalities and evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 and Title 18, United States Code, Sections 2 and 1956(h), as demonstrated in this attached affidavit. See **Attachment B** for further details.

D.    **INTRODUCTION**

9.    Since at least 2006, law enforcement officials have been investigating the drug-trafficking activity of **Lee Vaughn WALKER**, aka "Lee Dog," who, along with his associates, distributes methamphetamine, cocaine base in the form of crack cocaine (hereinafter "crack cocaine" or "cocaine base") and marijuana, mainly out of WALKER's apartment at **4881 Rolando Court, Apartment 69, in San Diego, California ("WALKER's apartment")**. In 2006, a detective with the San Diego Police Department ("SDPD") learned that WALKER was engaged in trafficking narcotics from WALKER's apartment, based on conversations with other law enforcement officers, confidential sources and cooperating defendants. Additionally, the SDPD Detective was aware of numerous complaints from tenants residing in the same apartment complex as WALKER, alleging that a black male was selling narcotics from WALKER's apartment.

10.    In early 2007, the Federal Bureau of Investigation ("FBI") began an active investigation of WALKER and his associates. Between March and October 2007, a confidential source ("CS"), working at the direction of the FBI, made five controlled purchases of crack cocaine and three receipts or controlled purchases of marijuana from WALKER.

11.    In September 2007 and October 2007, the Honorable Roger T. Benitez, District Judge, United States District Court for the Southern District of California, issued orders authorizing the interception of electronic communications occurring to and from telephones used by WALKER, specifically, telephone numbers **(619) 471-7660 ("Target Telephone 1")** and **(619) 602-5547 ("Target Telephone 2")**. Also, on or about September 17, 2007, agents installed a stationary camera to record visual surveillance of the front of WALKER's apartment. As a result of the Court-authorized interceptions of these telephones, and corresponding surveillance and

1  investigation conducted by the FBI, the FBI documented numerous drug transactions and identified
2  numerous individuals associated and involved with WALKER's drug-trafficking activities.

3          12.    In October 2007 and November 2007, with the aid of the Court-authorized
4  interceptions of WALKER's telephones, law enforcement officers made one seizure of
5  methamphetamine and two seizures of crack cocaine.

6          13.    Since the end of Court-authorized wire interceptions on November 19, 2007,
7  the FBI has continued to investigate WALKER and his associates, including, but not limited to,
8  conducting videotaped surveillance of WALKER's apartment and analyzing Court-authorized pen
9  registers of Target Telephones 1 and 2. The telephone activity on WALKER's two Target
10 Telephones and the foot traffic at WALKER's apartment are consistent with the drug-trafficking
11 activity observed during the period of Court-authorized wire interceptions (September 2007 to
12 November 2007), as well as prior to that time.

13          14.    Since this affidavit is being submitted for the limited purpose of securing
14 authorization for execution of a search warrant at the location to be searched, your affiant has not
15 included each and every fact known to your affiant concerning this investigation. Your affiant has
16 set forth only the facts that your affiant believes are necessary to establish the foundation for a search
17 warrant for this location.

18      **E.    SPECIFIC FACTS RELATING TO EACH CO-CONSPIRATOR**

19          15.    The following paragraphs summarize for each co-conspirator: (1) the evidence
20 of drug-trafficking gathered through the end of the period of wire interceptions on November 19,
21 2007 (including representative samples of intercepted communications and/or observed drug-
22 trafficking activities); (2) any gang membership; (3) prior similar drug-trafficking activity; and
23 (4) the surveillance and investigation of each co-conspirator's activities following the end of wire
24 interceptions ("Continuing Activity"). The Continuing Activity subsections include, among other
25 things, any evidence that the co-conspirator has continued telephone contact with WALKER or visits
26 to WALKER's apartment. During the two-month period of wire interceptions, each co-conspirator
27 listed below (with the exception of Felipe MEDINA) averaged between daily to weekly telephone
28 contact with WALKER concerning drug-trafficking or other criminal activity. During this same

7

1    period, there were multiple sales of narcotics at WALKER's apartment on a nearly daily basis.

2    Thus, I believe that any continuing telephone contact with WALKER or continuing visits to

3    WALKER's apartment by these individuals suggests an ongoing drug-trafficking relationship.

4    **(1)    Lee Vaughn WALKER, aka "Lee Dog"**

5            16.    **Summary:** Numerous controlled purchases, several seizures and hundreds of

6    wire intercepts involving conversations pertinent to criminal activity ("pertinent intercepts") of the

7    Target Telephones establish that WALKER distributes methamphetamine, crack cocaine and

8    marijuana, mainly from WALKER's apartment.  (All references to "pertinent intercepts" involve

9    calls intercepted during the two-month period of Court-authorized wire interceptions only.)  The

10    evidence of WALKER's drug-trafficking activity is discussed in detail below.

11            17.    **Gang Membership:** WALKER is a suspected Crips gang member.

12            18.    **Prior Similar Acts:** In **1993**, WALKER possessed cocaine base for sale, as

13    evidenced by his guilty plea in San Diego Superior Court criminal number CR138624.  In **1999**,

14    WALKER participated in the sale and transportation of cocaine base, as evidenced by his guilty plea

15    in San Diego Superior Court criminal number SCD144962.

16            19.    **Continuing Activity:** WALKER's activities following the end of wire

17    interceptions are discussed in detail below.

18    **(2)    Melvin ALEXANDER**

19            **(Oct. 14, 23, 26; Nov. 2, 4, 5, 16-17)**

20            20.    **Summary:** Approximately 89 pertinent intercepts between Melvin

21    ALEXANDER and the Target Telephones, as well as visual surveillance, establish that

22    ALEXANDER stores narcotics at his residence for WALKER and distributes crack cocaine and

23    methamphetamine for WALKER.  Specific examples of ALEXANDER's drug-trafficking activity

24    are described below for October 14, October 23, October 26, November 2, November 4, November 5

25    and November 16-17, 2007.

26            21.    **Prior Similar Acts:** In **1994**, ALEXANDER possessed cocaine base for sale,

27    as evidenced by his guilty plea in San Diego Superior Court criminal number SCD107722.  In **1999**,

28    ALEXANDER conspired to sell cocaine base and facilitated the sale of cocaine base, as evidenced

1  by his guilty plea in San Diego Superior Court criminal number SCD145932.  On **December 17,**
2  **2007**, the SDPD again arrested ALEXANDER for possession of cocaine base for sale (among other
3  charges), and ALEXANDER was released on bond on December 20, 2007.

4         22.   **Continuing Activity:**  Based on pen register analysis, ALEXANDER's
5  telephone continues to connect with one of WALKER's Target Telephones on almost a daily basis.
6  As mentioned above, on December 17, 2007, the SDPD arrested ALEXANDER for possession of
7  cocaine base for sale in front of his apartment complex, when he fled from officers and threw away
8  bags found to contain cocaine base and methamphetamine.

9         23.   On January 8, 2008, almost three weeks after his release on bond on his most
10  recent arrest, the covert stationary camera captured ALEXANDER at WALKER's apartment while
11  one of the suppliers, Eleodoro CASTILLO, aka "Onko", was arriving at WALKER's apartment.
12  (CASTILLO's prior documented visits to WALKER's apartment all appear to have been drug-
13  related.)

14         24.   Additionally, on January 10, 2008, an officer observed ALEXANDER getting
15  picked up in a Mercedes with paper plates outside ALEXANDER's apartment.  The Mercedes
16  transported ALEXANDER to one of the locations connected to Jose Galvan RICO, aka "Mija",
17  where ALEXANDER got out of the Mercedes and walked into an alley and out of sight.  (This was
18  the same location where agents had previously observed one of RICO's couriers, Felipe MEDINA,
19  enter in connection with an observed drug transaction.)  Approximately 15 minutes later, the
20  Mercedes returned, picked up ALEXANDER and departed the location.  Based on ALEXANDER's
21  prior history (including the fact that he had never before been seen in that Mercedes), the use of this
22  location for prior drug-trafficking activity, the brevity of the encounter, and the fact that
23  ALEXANDER and RICO appear to have a purely business (not social) relationship, I believe that
24  this event related to drug-trafficking.

25  **(3)**    **Jose Galvan RICO, aka "Mija"**
26       **(Oct. 5-6, 29-30; Nov. 1, 10, 16-17)**

27         25.   **Summary:**  Approximately 32 pertinent intercepts, as well as visual
28  surveillance, establish that Jose Galvan RICO, aka "Mija", was a supplier of crack cocaine for

9

1  WALKER.   WALKER typically telephones RICO to order multiple ounces of crack cocaine.

2  Specific examples of RICO's drug-trafficking activity are described below for October 5-6, October

3  29-30, November 1, November 10 and November 16-17, 2007.

4          26.   **Continuing Activity:** Since the end of wire interceptions, RICO's telephone

5  has continued to contact the at least one of WALKER's Target Telephones, although the last contact

6  was on December 26, 2007.   (Since drug dealers often change cellular phones, it is possible that

7  RICO has dropped his known telephone number.  For example, Eleodoro CASTILLO, aka "Onko",

8  changed his telephone number at least once during the 2-month period of wire interceptions.)

9  Agents have continued to observe RICO exiting his own residence, including a sighting as recently

10  as January 3, 2008.  In addition, as discussed above, on January 10, 2007, an officer observed

11  ALEXANDER enter one of the locations associated with RICO and leave approximately fifteen

12  minutes later.

13  **(4)  Eleodoro CASTILLO, aka "Onko"**

14        **(Oct. 5-6, 27, 27-28, 28; Nov. 2)**

15          27.   **Summary:** Approximately 40 pertinent intercepts, as well as visual

16  surveillance, establish that WALKER frequently telephoned Eleodoro CASTILLO, aka "Onko", to

17  order various amounts of crack cocaine.  Specific examples of CASTILLO's drug-trafficking activity

18  are described below for October 5-6, October 27, October 27-28, October 28 and November 2, 2007.

19          28.   **Continuing Activity:** Since the end of wire interceptions, CASTILLO's

20  telephone has continued to connect with at least one of WALKER's Target Telephones frequently,

21  with the most recent connection occurring on January 8, 2008 (as of the pen register analysis on the

22  morning of January 10, 2008).   As recently as January 8, 2008, the covert stationary camera

23  videotaped CASTILLO entering WALKER's apartment.

24  **(5)  Daphne Rosalinda JACKSON, aka Daphne R. Rae**

25        **(Sept. 26; Oct. 3, 5-6, 19, 22, 23; Nov. 11, 13)**

26         29.   **Summary:** Over 100 pertinent intercepts of the Target Telephones, as well as

27  visual surveillance, establish that Daphne Rosalinda JACKSON, aka Daphne R. Rae, helps run the

28  drug-trafficking activities at WALKER's apartment, including cooking narcotics, meeting with

1  suppliers and distributing to drug users. Specific examples of JACKSON's drug-trafficking activity

2  are described below for September 26, October 3, October 5-6, October 19, October 22, October 23,

3  November 11 and November 13, 2007.

4          30.    **Continuing Activity:** During the period of wire interceptions, Daphne

5  JACKSON often spoke to WALKER by using one of his own Target Telephones, which was left at

6  WALKER's apartment. However, she has used several other phones to speak with WALKER. As

7  of January 10, 2008, the last time the telephone that lists her as a subscriber contacted WALKER

8  was on December 31, 2007. Daphne JACKSON was captured on video entering WALKER's

9  apartment as recently as January 5, 2008.

10 **(6)    Bernal Anthony MITCHELL, aka "Tony"**

11       **(Oct. 29-30; Nov. 9, 16)**

12          31.    **Summary:** Approximately 39 pertinent intercepts of the Target Telephones,

13 as well as visual surveillance, establish that Bernal Anthony MITCHELL, aka "Tony", lives at

14 WALKER's apartment and helps run the drug-trafficking activities at WALKER's apartment,

15 including meeting with suppliers and distributing narcotics to drug users. Specific examples of

16 MITCHELL's drug-trafficking activity are described below for October 29-30, November 9, and

17 November 16, 2007.

18          32.    **Continuing Activity:** MITCHELL continues to live at WALKER's

19 apartment. Since the end of wire interceptions, MITCHELL has been captured on video almost

20 everyday entering WALKER's apartment, most recently on January 8, 2008.

21 **(7)    Allen Matthew BAKER Jr., aka "J.R.", aka Tracy Reyard Diggs, aka Marcus Johnson**

22       **(Oct. 6-7, 14, 28)**

23          33.    **Summary:** Approximately 9 pertinent intercepts of the Target Telephones

24 establish that Allen Matthew BAKER Jr., aka "J.R.", aka Tracy Reyard Diggs, aka Marcus Johnson,

25 supplies WALKER with crack cocaine, and is involved in drug sales with WALKER. Specific

26 examples of BAKER's drug-trafficking activity are described below for October 6-7, October 14,

27 and October 28, 2007.

28          34.    **Gang Membership:** BAKER is a documented member of the Lincoln Park

11

1   Bloods gang.

2       35.   **Prior Similar Acts:** In **1989**, BAKER possessed marijuana for sale, as

3   evidenced by his guilty plea in San Diego Superior Court criminal number CR111240. In **1995**,

4   BAKER sold cocaine base, as evidenced by his guilty plea in San Diego Superior Court criminal

5   number SCD108674. In **1999**, BAKER transported 9.76 grams of cocaine base, as evidenced by his

6   guilty plea in San Diego Superior Court criminal number CDF143319.

7       36.   **Continuing Activity:** BAKER currently has two felony warrants for his

8   arrest. The last known address for BAKER was in La Mesa, where he provided to the apartment

9   management a copy of a Virginia driver license in the name of Marcus Johnson (one of his aliases).

10   This affiant has reliable information that BAKER is currently using a cellular telephone subscribed

11   to South Coast Pool Plastering. Based on pen register analysis on January 10, 2008, this telephone

12   has been in contact with at least one of WALKER's Target Telephones, most recently on January 1,

13   2008.

14   **(8)   Michael Dwayne TRYALS, aka "Texas Mike", aka Michael Tryls, aka Dave Brooks,**

15       **aka Leon Howard Blair, aka Earl David Hollis**

16       **(Oct. 28, 30; Nov. 4, 9)**

17       37.   **Summary:** Approximately 21 pertinent intercepts of the Target Telephones

18   establish that Michael Dwayne TRYALS, aka "Texas Mike", aka Michael Tryls, aka Dave Brooks,

19   aka Leon Howard Blair, aka Earl David Hollis, and WALKER share suppliers of crack cocaine, and

20   are involved in purchasing and selling narcotics to one another. Specific examples of TRYALS's

21   drug-trafficking activity are described below for October 28, October 30, November 4, and

22   November 9, 2007.

23       38.   **Prior Similar Acts:** In **1982**, TRYALS possessed marijuana for sale, as

24   evidenced by his guilty plea in San Diego Superior Court criminal number CR60844. In **1984**,

25   TRYALS possessed cocaine, as evidenced by his jury trial conviction and 2-year sentence in San

26   Diego Superior Court criminal number CR71681. In **1989**, TRYALS possessed cocaine for sale, as

27   evidenced by the felony complaint filed in San Diego Superior Court criminal number CR109632, as

28   well as his guilty plea and 2-year sentence for possession of cocaine in that same case.

39.  **Continuing Activity:** During the period of wire interceptions, TRYALS never used telephones subscribed in his own name. Instead, TRYALS typically contacted WALKER using one of four telephones that were subscribed to three different individuals, including one individual with whom he lives. Based on pen register analysis on January 10, 2008, all of these telephones have been in contact with at least one of WALKER's Target Telephones, with the most recent contacts occurring between January 5 and January 8, 2008. On January 8, 2008, the covert stationary camera captured a person who resembles TRYALS entering WALKER's apartment.

**(9)    Bobby Shawn LOCKHART, aka "Blue"**

   **(Sept. 29; Oct. 23; Nov. 5)**

40.  **Summary:** Approximately 32 pertinent intercepts, as well as visual surveillance, establish that LOCKHART works at WALKER's apartment on almost a daily basis, assisting with the distribution of narcotics. Specific examples of LOCKHART's drug-trafficking activity are described below for September 29, October 23, and November 5, 2007.

41.  **Gang Membership:** LOCKHART is a documented member of the West Coast Crips gang.

42.  **Prior Similar Acts:** In **1998**, LOCKHART possessed Phencyclidine ("PCP"), as evidenced by his guilty plea in San Diego Superior Court criminal case number CDF137253. In **2007**, LOCKHART possessed methamphetamine, as evidenced by his guilty plea in San Diego Superior Court criminal number CS210358.

43.  **Continuing Activity:** During the period of wire interceptions, LOCKHART often spoke to WALKER using one of WALKER's own Target Telephones, and LOCKHART used several other phones to speak with WALKER. Based on pen register analysis on January 10, 2008, one of these telephones contacted one of the Target Telephones as recently as January 8, 2008. Additionally, the stationary camera filmed LOCKHART entering WALKER's apartment on December 27, 2007.

**(10)    Alexander WEIR IV, aka "Brick"**

   **(Sept. 30; Oct. 6-7, 11, 20, 22)**

44.  **Summary:** Approximately 64 pertinent intercepts, as well as visual

13

1  surveillance, establish that Alexander WEIR IV, aka "Brick", is a sub-distributor of

2  methamphetamine for WALKER, and also deals in crack cocaine. Specific examples of WEIR IV's

3  drug-trafficking activity are described below for September 30, October 6-7, October 11, October 20,

4  and October 22, 2007.

5         45.   **Gang Membership:** WEIR IV is a suspected member of the Lincoln Park

6  Bloods gang.

7         46.   **Prior Similar Acts:** In **2002**, WEIR IV sold cocaine base and possessed

8  cocaine base for sale, as evidenced by his guilty plea in San Diego Superior Court criminal number

9  CDF169691.

10         47.   **Continuing Activity:** During the period of wire interceptions, WEIR IV never

11  used telephones subscribed in his own name to contact WALKER. Based on pen register analysis on

12  January 10, 2008, one of the telephones that WEIR IV regularly used to contact WALKER, which is

13  subscribed to Pedria Starks, contacted one of the Target Telephones as recently as January 1, 2008.

14  On January 5, 2008, agents observed Pedria Starks and someone they believed to be WEIR IV

15  arriving at their residence in the Cadillac that is registered to WEIR IV and Starks. (During past

16  surveillances at WALKER's apartment, WEIR IV had been positively identified as the driver of the

17  same Cadillac.) Both Starks and the person who is believed to be WEIR IV entered the residence

18  that is listed as the address on the Cadillac's registration.

19  **(11)   Alexander WEIR V, aka "Lil' Brick"**

20         **(Oct. 19, 29; Nov. 6)**

21         48.   **Summary:** Approximately 19 pertinent intercepts, as well as visual

22  surveillance, establish that Alexander WEIR V, aka "Lil' Brick" (who is WEIR IV's son), distributes

23  crack cocaine for WALKER. Specific examples of WEIR V's drug-trafficking activity are described

24  below for October 19, October 29, and November 6, 2007.

25         49.   **Gang Membership:** WEIR V is a documented member of the Lincoln Park

26  Bloods gang.

27         50.   **Prior Similar Acts:** In **2003**, WEIR V transported cocaine base, as evidenced

28  by his guilty plea in San Diego Superior Court criminal number SCD176613.

14

51.    **Continuing Activity:** As recently as January 9, 2008, agents observed WEIR V entering and exiting the apartment where he is residing.

**(12)    Felipe MEDINA**

**(Oct. 5-6; Nov. 1, 10)**

52.    **Summary:** Intercepts, visual surveillance and one seizure establish that Felipe MEDINA is a courier for Jose Galvan RICO, aka "Mija". Specific examples of MEDINA's drug-trafficking activity are described below, including agents' surveillance on October 5-6 and November 1, 2007, as well as MEDINA's arrest on November 10, 2007 with 119.68 grams of crack cocaine.

53.    **Continuing Activity:** MEDINA has been in continuous state custody since his arrest on November 10, 2007.

**(13)    Melvin Andre BIBBS**

**(Oct. 19, 23, 27-28)**

54.    **Summary:** Approximately 64 pertinent intercepts, as well as visual surveillance, establish that Melvin Andre BIBBS distributes crack cocaine for WALKER. Specific examples of BIBBS' drug-trafficking activity are described below for October 19, October 23 and October 27-28, 2007.

55.    **Prior Similar Acts:** In **2005**, BIBBS possessed cocaine base for sale, as evidenced by his guilty plea in San Diego Superior Court criminal number SCD190002.

56.    **Continuing Activity:** During the period of wire interceptions, BIBBS used two telephones to contact WALKER. Based on pen register analysis on the morning of January 10, 2008, both of those telephones are still in contact with at least one of WALKER's Target Telephones, with the most recent calls occurring on January 1 and January 3, 2008. BIBBS has not been observed with WALKER lately, but on December 12, 2007, a SDPD confidential informant ("CI") purchased narcotics from a facilitator on the street in front of BIBBS' residence, which is located at 4068 44th Street, Apt. 104, San Diego, California ("BIBBS' apartment"). The SDPD officers observed a facilitator take the CI's money, walk to BIBBS' apartment and enter, and then return to the CI with narcotics.

15

1   **(14)**    **Mark Edward RUNNELS, aka "Marky Mark"**

2          **(Oct. 5-6, 13, 27; Nov. 11)**

3          57.   **Summary:** Approximately 48 pertinent intercepts, along with visual

4 surveillance, establish that Mark Edward RUNNELS, aka "Marky Mark", operates as a courier of

5 drugs, assists with preparing drugs, speaks on the telephone with suppliers, accepts drug deliveries

6 from suppliers and assists in selling drugs to users. Specific examples of RUNNELS' drug-

7 trafficking activity are described below for October 5-6, October 13, October 27 and November 11,

8 2007.

9          58.   **Gang Membership:** RUNNELS is a suspected gang member.

10          59.   **Continuing Activity:** During the period of wire interceptions, RUNNELS

11 never used telephones subscribed in his own name to contact WALKER. Typically, RUNNELS

12 contacted WALKER using the Target Telephone that WALKER left at his apartment. RUNNELS

13 continues to frequent WALKER's apartment. As recently as January 9, 2008, the stationary camera

14 videotaped RUNNELS entering WALKER's apartment.

15   **(15)**    **Niesha Shawnee ARMSTRONG, aka Niesha S. Jackson**

16          **(Oct. 1; Nov. 9)**

17          60.   **Summary:** Approximately 50 pertinent intercepts, as well as visual

18 surveillance, establish that Niesha Shawnee ARMSTRONG, aka Niesha S. Jackson, distributes crack

19 cocaine, marijuana and methamphetamine. Specific examples of ARMSTRONG's drug-trafficking

20 activity are described below for October 1 and November 9, 2007.

21          61.   **Continuing Activity:** Since the end of wire interceptions, ARMSTRONG's

22 telephone has continued to contact at least one of WALKER's Target Telephones on almost a daily

23 basis, with the most recent contact occurring on January 8, 2008 (per a pen register analysis on the

24 morning of January 10, 2008). Additionally, on January 9, 2008, agents observed WALKER leave

25 ARMSTRONG's apartment complex in La Mesa and thereafter observed ARMSTRONG also leave

26 her apartment complex.

27   //

28   //

1    **(16)    Gloria JACKSON**

2          **(Nov. 5, 13, 16)**

3          62.    **Summary:** Approximately 31 pertinent intercepts, as well as visual

4    surveillance, establish that Gloria JACKSON distributes crack cocaine for WALKER.    Specific

5    examples of JACKSON's drug-trafficking activity are described below for November 5,

6    November 13 and November 16, 2007.

7          63.    **Continuing Activity:** Since the end of the period of wire interceptions, Gloria

8    JACKSON's telephone has continued to contact at least one of WALKER's Target Telephones

9    frequently, with the most recent contact occurring on January 7, 2008 (per a pen register analysis on

10   the morning of January 10, 2008).  On January 7, 2008, officers observed JACKSON parked outside

11   her apartment complex in her vehicle (the same vehicle JACKSON drove from WALKER's

12   apartment complex after picking up narcotics on November 13, 2007).

13   **(17)    Craig Anthony WILSON**

14         **(Oct. 3, 23)**

15         64.    **Summary:** Approximately 47 pertinent intercepts, as well as visual

16   surveillance, establish that Craig Anthony WILSON distributes methamphetamine for WALKER.

17   Specific examples of WILSON's drug-trafficking activity are described below for October 3 and

18   October 23, 2007.

19         65.    **Continuing Activity:** Since the end of wire interceptions, WILSON's

20   telephone has continued to contact at least one of WALKER's Target Telephones frequently, with

21   the most recent contact occurring on January 8, 2008 (per a pen register analysis conducted on the

22   morning of January 10, 2008).

23         **F.    INVESTIGATION OVERVIEW**

24         66.    As mentioned above, in 2006 an SDPD Detective learned that WALKER was

25   selling narcotics, based on conversations with other law enforcement officers, confidential sources,

26   cooperating defendants and complaints from tenants residing in the same apartment complex as

27   WALKER, alleging that a black male was selling narcotics from WALKER's apartment.  In 2007,

28   the FBI began a formal investigation of WALKER, including hiring CS to make purchases of

17

1   narcotics from WALKER that were recorded and monitored. CS has been cooperating with the FBI

2   since 2004. In that time period, CS has consistently provided truthful information which was

3   corroborated by other confidential sources and/or other investigators. CS has felony convictions for

4   perjury (specifically, using a fake birth certificate to apply for a driver license, and then signing the

5   driver license application under penalty of perjury), grand theft, and theft by use of access card data

6   in 1991; forge an access card to defraud in 1995; second-degree burglary in 1996; and false

7   checks/record/certifications in 2003.

8         67. On or about September 17, 2007, the FBI installed a stationary video camera

9   which allows monitoring of the front of WALKER's apartment. Between September 21, 2007 and

10  November 19, 2007, the FBI intercepted conversations on one or both of the Target Telephones

11  belonging to WALKER. The investigation is ongoing, and includes, among other things, monitoring

12  of Court-authorized pen registers of the Target Telephones and video surveillance.

13        **CONTROLLED RECEIPT: Marijuana (March 17, 2007)**

14        68. On March 17, 2007, WALKER gave CS a small bag of marijuana, valued at

15  approximately $20.

16        **OBSERVED SALES: Methamphetamine, Cocaine Base and Marijuana (April 4, 2007)**

17        69. On April 4, 2007, while inside WALKER's apartment, CS witnessed

18  WALKER selling marijuana, methamphetamine, and cocaine base.

19        **CONTROLLED RECEIPT: Marijuana (April 11, 2007)**

20        70. On April 11, 2007, WALKER asked CS to follow WALKER to a location

21  where WALKER would pick up marijuana. Agents followed CS and WALKER and conducted

22  surveillance of the transaction. WALKER entered a commercial building located on 54th Street, San

23  Diego, California, while CS remained in CS's vehicle. WALKER exited the building approximately

24  five minutes later and walked to CS's vehicle. WALKER removed a small amount of marijuana

25  from a larger bag of marijuana, placed the smaller amount in a small plastic bag, and gave the small

26  plastic bag to CS.

27        **CONTROLLED PURCHASE: 71.8 Grams of Cocaine Base (May 9, 2007)**

28        71. On May 9, 2007, CS made a controlled and recorded purchase from

1  WALKER of approximately 71.8 grams of cocaine base for $1800.  CS, who was wearing a

2  concealed transmitter/recorder, met WALKER in WALKER's apartment, and inquired about

3  purchasing three ounces of cocaine base.  WALKER informed CS that it would cost $600 an ounce.

4  After confirming that CS had the money for three ounces of cocaine base, WALKER told CS to wait

5  approximately 30 minutes.

6        72.    Approximately 50 minutes later, CS went back to WALKER's apartment, and

7  observed WALKER and an unknown male ("UM1") counting stacks of money.  WALKER told CS

8  to give him another five minutes.

9        73.    Approximately 35 minutes later, in a conversation that was covertly

10  audiotaped and videotaped, an unknown male ("UM2") approached CS and informed CS that

11  WALKER told him to bring the three ounces of cocaine base to CS.  UM2 handed CS the cocaine

12  base, for which CS paid UM2 $1800.  UM2 told CS that if CS wanted more in the future to go

13  through WALKER.

14        74.    Later analysis of the cocaine base revealed that it weighed approximately

15  71.8 grams (2.53 ounces).  Although a full ounce weighs approximately 28.3 grams, it is typical for

16  drug dealers in San Diego County to sell amounts that are "light."  WALKER typically provides no

17  more than 24 grams (excluding the plastic baggie) for a one-ounce purchase.  Thus, a three-ounce

18  (85.0-gram) purchase, such as this one, would generally weigh no more than 72 grams, without the

19  bag.

20            **CONTROLLED PURCHASE: Marijuana (May 16, 2007)**

21        75.    On May 16, 2007, CS made a controlled and recorded purchase from

22  WALKER of approximately one-quarter ounce of marijuana for $110.  CS, who was provided with

23  $200 and a concealed transmitter/recorder, met with WALKER inside WALKER's apartment, and

24  inquired about purchasing a quarter-ounce of marijuana.  WALKER proceeded into his kitchen and

25  produced a large bag of marijuana from one of the cabinets.  WALKER produced a scale and

26  weighed approximately a quarter-ounce of marijuana.  WALKER provided CS with the marijuana in

27  exchange for $110.  WALKER told CS that if CS wanted more cocaine base, WALKER could place

28  a call and get it for CS.

1

## CONTROLLED PURCHASE: 71.2 Grams of Cocaine Base (May 23, 2007)

2     76.    On May 23, 2007, CS made a controlled and recorded purchase from

3 WALKER of approximately 71.2 grams of cocaine base for $1800. Outfitted with a concealed

4 transmitter/recorder, CS met with WALKER inside WALKER's apartment. WALKER told CS he

5 would have someone knock on CS's door and the person will "bring that to you." WALKER told

6 CS to have the money ready, and that it would be the same price as last time.

7     77.    Approximately 25 minutes later, an unknown female ("UF1") approached CS.

8 UF1 produced from a baseball cap a plastic bag that contained three individually wrapped pieces of

9 cocaine base, weighing approximately 71.2 grams (2.51 ounces) in total. CS paid $1800 to UF1 in

10 exchange for the cocaine base.

11

## CONTROLLED PURCHASE: 45.9 Grams of Cocaine Base (June 14, 2007)

12     78.    On June 14, 2007, CS made a controlled and recorded purchase from

13 WALKER of approximately 45.9 grams of cocaine base for $1200. While wearing a concealed

14 transmitter/recorder, CS met with WALKER inside his apartment and told WALKER that CS

15 wanted two ounces of cocaine base. WALKER spoke to someone on Target Telephone 1 and asked

16 if the person had three ounces of cocaine base for him. WALKER told the caller to bring them to

17 him but to wait until dark. WALKER hung up Target Telephone 1 and told CS that CS would

18 receive the two ounces in approximately 45 minutes.

19     79.    Approximately 70 minutes later, WALKER approached CS. WALKER

20 provided from his pocket two individually wrapped pieces of cocaine base, weighing a total of

21 approximately 45.9 grams (1.62 ounces). CS paid WALKER $1200 for the cocaine base.

22

## CONTROLLED PURCHASE: 10.8 Grams of Cocaine Base (July 17, 2007)

23     80.    On July 17, 2007, CS made a controlled and recorded purchase from

24 WALKER of approximately 10.8 grams of cocaine base for $300. Upon arriving at the apartment

25 complex, CS placed a consensually recorded telephone call to Target Telephone 1 and told

26 WALKER that CS wanted to purchase an ounce of cocaine base from him. In a later conversation,

27 WALKER directed CS to come to WALKER's apartment. When CS arrived, WALKER informed

28 CS that he only had a half-ounce of cocaine base. WALKER gave CS approximately 10.8 grams

1  (0.38 ounces) of cocaine base, for which CS paid $300 to WALKER.

2  ### INTERCEPTS: Methamphetamine (Sept. 26, 2007)

3  ### (WALKER and D. JACKSON)

4        81.    On September 26, 2007, at approximately 4:37 p.m., WALKER telephoned

5  Daphne JACKSON, who was at WALKER's apartment. WALKER told JACKSON that "the white

6  boy Bobby's out there in a convertible Porsche, up in the . . . on the side and . . . where I park my

7  truck up there near the front." WALKER told JACKSON, "Give him um, you know um, you know

8  that girl Christina?" WALKER told JACKSON, "Remember I told you for um, fifty cent?"

9        82.    Based on my training and experience, and my review of hundreds of intercepts

10 and other investigation in this case, I believe "that girl Christina" refers to crystal methamphetamine

11 and that WALKER was telling JACKSON to sell Bobby the methamphetamine for $50. (On

12 October 2, 2007, agents observed "Bobby," whose identity is known, driving a Porsche into

13 WALKER's apartment complex. The vehicle is registered to someone who lives at the same address

14 as Bobby and the license plate on the Porsche contains Bobby's last name.)

15       83.    Within minutes, JACKSON left WALKER's apartment.

16 ### INTERCEPTS: One-Quarter Ounce of Methamphetamine (Sept. 29, 2007)

17 ### (WALKER and LOCKHART)

18       84.    On September 29, 2007, at approximately 2:17 p.m., a white female

19 nicknamed "Shay," whose identity is known, telephoned WALKER to ask for "two of those that I

20 got of the Christina." WALKER asked if she wanted two "whole ones." Shay said she wanted two

21 like she got from him before. WALKER told her to come on and hurry up, because he had it right

22 now.

23       85.    At approximately 2:21 p.m., WALKER telephoned LOCKHART to say, "You

24 got $300 coming by the white broad, she wants to shoot two games of pool with you for $300."

25 LOCKHART replied, "Let me go make it." WALKER told him, "She's coming, the lady Shay, the

26 white girl," and added "go ahead and deal with that with Daph." (Daphne JACKSON's nickname is

27 "Daph".)

28       86.    At approximately 3:43 p.m., a white female resembling Shay entered

1  WALKER's apartment and left at approximately 4:09 p.m.

2          87.    Based on my training and experience, and my review of hundreds of intercepts

3  in this case (in particular, those relating to WALKER and Shay's other dealings), I believe that

4  "Christina" refers to crystal methamphetamine and that "two games of pool" refers to two "8-balls"

5  or two eighths of an ounce.  I believe that WALKER was telling LOCKHART to sell Shay two "8-

6  balls" (a full quarter-ounce) of crystal methamphetamine for $300.

7          **INTERCEPTS (Sept. 30, 2007)**

8          **(WALKER and WEIR IV)**

9          88.    On September 30, 2007, at about 10:13 a.m., WEIR IV entered WALKER's

10  apartment.  At approximately 10:20 a.m., a person nicknamed "Abbi-Ab" entered WALKER's

11  apartment.  At approximately 10:28 a.m., WALKER spoke to WEIR IV on the telephone.

12  WALKER said, "Don't be givin' that boy nothin'.  He ain't gonna pay, homie."  WEIR IV asked,

13  "Who, Abbi-Ab?"  WALKER replied, "Yeah."  WEIR IV said, "Oh, I just gave him . . . I just gave

14  him somethin'."  WALKER went on to say that Abbi-Ab "be smokin'" and that WALKER told

15  Abbi-Ab he was "bad business."  WEIR IV asked, "How can you go from ballin' to smokin'?"

16  WALKER later said, "If you can go from ballin' to smokin', you can go from ballin' to snitchin',

17  nigger. . . . so I'm kinda scared of him right now, homie."

18          89.    Based on my training and experience, and my review of hundreds of intercepts

19  in this case, I believe that WALKER was instructing WEIR IV not to provide any narcotics to

20  Abbi-Ab in the future, because Abbi-Ab had gone from dealing drugs ("ballin'") to using them

21  ("smokin'").  WALKER also believed that Abbi-Ab could become a police informant ("snitchin'").

22          **INTERCEPTS: Quarter-Ounce of Cocaine Base (Oct. 1, 2007)**

23          **(WALKER and ARMSTRONG)**

24          90.    On October 1, 2007, at approximately 9:26 p.m., WALKER spoke on the

25  telephone to ARMSTRONG, who said, "Listen, um, somebody I know wants to get like a uh,

26  dub-fifty or somethin'. . . . I ain't gonna bring them with me, but I'll bring they money."  WALKER

27  responded, "Shit, I'm, but right now . . . shit, it's gon' be about thirty to forty-five minutes."  Based

28  on my training and experience, and my review of hundreds of intercepts in this case, I believe that a

1   "dub-fifty" refers to $150 and that, based on other intercepts involving ARMSTRONG as well as

2   WALKER's usual pricing, ARMSTRONG wanted to obtain a quarter-ounce of cocaine base to

3   provide to a buyer.

4         91.    At approximately 11:09 p.m., WALKER telephoned ARMSTRONG and

5   asked if she still wants "that." ARMSTRONG said she would find out and call him back.

6         **INTERCEPTS: Cocaine Base and 1 Ounce of Methamphetamine (Oct. 3, 2007)**

7         **(WALKER, D. JACKSON and WILSON)**

8         92.    On October 3, 2007, at approximately 10:22 a.m., a Latino male (identified as

9   a supplier of methamphetamine for WALKER) telephoned WALKER. WALKER asked for "one."

10  The Latino male said, "Twenty-five minutes." .

11        93.    At approximately 10:24 a.m., WALKER called Daphne JACKSON to tell her

12  to go in his room and that "right there near the table is some black and white, um, Nikes. . . . There's

13  six-hundred dollars in there. . . . The Mexican comin'." WALKER told JACKSON to give the

14  Mexican "the other one" and tell him "I'll pay 'em the rest later."

15        94.    WALKER also told JACKSON, "[T]hen my homeboy Craig A. gonna come.

16  He . . . um, he's coming for that girl Christina." (WALKER sometimes calls Craig Anthony

17  WILSON by the nickname "Craig A.") WALKER instructed JACKSON, "Give him um, half of that

18  and he's gonna give you, five, five dollars." JACKSON asked, "We got that in there, too?"

19  WALKER said, "No, the Mexican's gonna bring that. When he comes give him the six-hundred in

20  the shoe."

21        95.    At approximately 10:30 a.m., WALKER left a voicemail on the telephone of

22  Craig WILSON, telling WILSON to give him a call, because there will be "soup" within the hour.

23        96.    Based on my training and experience, and my review of hundreds of intercepts

24  in this case, I believe that WALKER ordered 1 ounce of methamphetamine from one of his Mexican

25  suppliers on this occasion. WALKER then instructed JACKSON to find $600 that was hidden in his

26  shoes. WALKER instructed JACKSON to pay $600 to the Mexican supplier, in exchange for the

27  1 ounce of methamphetamine, and to tell the Mexican supplier that WALKER would pay him the

28  rest later. I believe WALKER also instructed JACKSON to give another one of his distributors,

1  Craig WILSON, one-half ounce of methamphetamine for $500.   (WALKER typically sells

2  methamphetamine for a street price of $1000 per ounce or $500 per half-ounce, but buys it from his

3  suppliers for considerably less.)

4      97.    At approximately 11:27 a.m., WILSON called WALKER and asked, "What's

5  up, man?"  WALKER said he was waiting for this "fool" to "drop it" right now.  WALKER said that

6  as soon as he got there, he would call WILSON right back.

7      98.    At about 11:34 a.m., WALKER telephoned WILSON and said, "Alright, go

8  on.  Tell Daph . . . go on.  She got it.  She got the whole thing.  Tell her to give you the half."

9  WILSON asked, "The what?"  WALKER replied, "The half for the . . . go ahead, she . . . go ahead

10  and tell her what to do.  She's there.  I'm at work, but she got it there.  He just got there."  WILSON

11  replied, "Okay, alright."  WALKER asked WILSON, "When you goin'?"  WILSON said, "Now."

12      99.    At about 11:38 a.m., WALKER telephoned JACKSON and asked, "You gave

13  him the six, right?"  JACKSON replied, "Yeah, I got . . . what, what you gave me."  WALKER

14  asked, "[S]o, you got four left of that other, you still got that right . . . what I told you, right . . . of the

15  . . . . [h]ard?"  JACKSON said, "Yeah, the quarter and the um, and the . . ."  WALKER said, "And

16  the, the half, yeah. . . . Now Craig's gonna come and give you five. . . . And, and you gon' give him

17  half.  You take the five and when you get rid of the other stuff, I'm gon' call the other boy to bring

18  you two, alright?"   JACKSON asked, "Um, I'm gon' give him half of the stuff that came?"

19  WALKER replied, "Yeah, yeah, he gon' give you five, five dollars."

20      100.    Based on my training and experience, and my review of hundreds of intercepts

21  in this case, I believe that JACKSON confirmed that she paid the Mexican supplier $600 for 1 ounce

22  of methamphetamine, and WALKER then instructed JACKSON to give WILSON one-half ounce of

23  methamphetamine for $500.  When WALKER asked if JACKSON had "four left of that other . . . of

24  the . . . . hard," I believe that the "hard" or "the other" refers to crack cocaine.

25      **INTERCEPTS: 4 Ounces of Cocaine Base (Oct. 5-6, 2007)**

26      **(WALKER, RICO, CASTILLO, D. JACKSON, MEDINA and RUNNELS)**

27      101.    On October 5, 2007, at approximately 12:03 p.m., WALKER told Daphne

28  JACKSON that "the boy is coming, Mija."   Later, agents observed a person who resembles

24

1  MEDINA entering WALKER's apartment and soon thereafter exiting WALKER's apartment.
2  (MEDINA is believed to be a courier for RICO, aka "Mija".)  At 1:09 p.m., WALKER asked if "he"
3  came.  JACKSON said "yes."  WALKER asked that MITCHELL walk around the complex, because
4  "they" are talking about people following them.

5          102.    At approximately 3:33 p.m., WALKER called CASTILLO to say that he
6  needed "cuatro" once he got off work.  ("Cuatro" is the Spanish word for "four.")  WALKER said he
7  would be there at 5:30 p.m. and to have "cuatro" ready for him.

8          103.    The following day, on October 6, 2007, at approximately 5:00 p.m.,
9  RUNNELS told WALKER the "Ese" was on his way.  At 5:16 p.m., RUNNELS and WALKER
10 spoke again on the telephone.  RUNNELS said, "Hey, talk to the eses for me, 'cause I talked to 'em.
11 I told him it was me, Marcos. . . . I told him to come on."  WALKER asked, "Alright, which one?"
12 RUNNELS said, "He said you want four?"  WALKER replied, "Which one?  Oh, Mija?"
13 RUNNELS replied, "Yeah, he said he's gonna bring four.  Let him know, let him know it's okay."
14 WALKER replied, "I can't."  Then RUNNELS said, "Well, he's coming anyway."  WALKER said,
15 "I got the other one coming, too.  Whoever comes first.  Play it like that."

16         104.    At about 5:50 p.m., WALKER telephoned RUNNELS and asked, "He got
17 there?"  RUNNELS replied, "Yeah, they came, homie."  WALKER asked, "Both of 'em or just one
18 of 'em?"  RUNNELS said, "Just one."  WALKER asked, "Onko? . . . . Is it Onko?"  Then
19 RUNNELS said, "Onko, yeah, him."

20         105.    Based on my training and experience, and my review of hundreds of intercepts
21 in this case, I believe that RUNNELS told RICO, aka "Mija", that he could deliver 4 ounces of crack
22 cocaine to WALKER's apartment, while WALKER had told CASTILLO, aka "Onko", that he could
23 deliver the same amount.  I believe WALKER was telling RUNNELS to buy the narcotics from
24 whichever supplier arrived first.

25                   **INTERCEPTS: 9 Ounces of Crack Cocaine (Oct. 6-7, 2007)**
26                              **(WALKER, BAKER and WEIR IV)**

27         106.    On October 6, 2007, at approximately 6:58 p.m., BAKER called WALKER,
28 saying he wanted to be paid "forty-five, homie, cause that's five-hundred a piece."  WALKER stated,

                                            25

1  "I give you forty-two, but this is gonna be a consistent thing with me. It's gonna be bigger and

2  better."

3         107.    At 7:40 p.m., WALKER telephoned BAKER to say that he was "ready."

4  BAKER responded, "Yeah, but you know I was sittin' here bein' stupid, she talkin' about forty-two,

5  yeah, I'll get you forty-two. Nigga, you better give me forty-five, motherfucker, that's five hundred."

6  Later in the conversation, BAKER said, "But, but I said forty-two because I wasn't even countin',

7  man. I'm like damn, I'm gon' be runnin' for two hundred?" WALKER said, "Shit, yeah, I mean,

8  alright, alright. But goddamn I mean if I come all the time what about . . . by half of what you get

9  then? Um, we talk when I see, I'm gon' give you the forty-five. . ."

10        108.    Based on my training and experience, and my review of hundreds of intercepts

11  in this case, as well as WALKER's usual drug pricing, I believe that WALKER and BAKER were

12  discussing the price of crack cocaine. BAKER wanted to be paid $4500    ($500 per ounce, for 9

13  ounces of crack cocaine), while WALKER wanted to pay only $4200, because he would be a regular

14  customer. WALKER typically sells crack cocaine for a street price of $600-$650 per ounce, but

15  buys it from his suppliers for considerably less.

16        109.    On October 7, 2007, at approximately 12:13 p.m., WEIR IV telephoned

17  WALKER to ask what was happening. WALKER said, "Ain't no good, homie. Ain't no good. I, I

18  cooked that shit, ain't no good. I'm tryin' to . . . I'm callin' that nigga right now." WEIR IV said,

19  "Are you . . . I, I looked at it. I looked at it and could tell. It was too, it was too, it was too cut up.

20  How many of 'em you get?" WALKER replied, "Nine. . . . I'm gettin' my money back, though. I'm

21  callin' the nigger. I'm on him. I'm gettin' my money back." WEIR IV asked, "What'd you, what'd

22  you spend, seven thousand?" WALKER replied, "Nah, nah."

23        110.    At approximately 2:20 p.m., BAKER telephoned WALKER and said, "I'm on

24  my way over to the Ese's. . . . I'm gonna get them uh, the one's that uncooked and then I just have to

25  take care of that other shit. He gonna just trade it or get somethin' else." WALKER replied, "Thank

26  you, sir."

27        111.    Later in the conversation, BAKER said, he was "tryin' to tell you that I had

28  cheffed one. I was tryin' to tell ya that I had that one and it did do that. It came back eleven out of

26

1   twenty-eight [there are 28.3 grams in 1 ounce]. . . . Yeah, but I, I wanted to do it too so that I could

2   let them see, look, this is what's up, but I already dumped this here . . ." BAKER also told

3   WALKER, "You don't have to worry about nothin'. I got your bread anyway. I told you, I bought

4   it, so I had yo' money anyway."

5           112.   During the same conversation, BAKER asked WALKER if he "could tell 'em

6   that they could use that one that you had did, though." WALKER said, "No, I'm, I, I put it all up,

7   everything's stashed, cause you said don't fuck with it, so I stashed it."

8           113.   Based on my training and experience, and my review of hundreds of intercepts

9   in this case, I believe that WALKER and WEIR IV believed that the 9 ounces of crack cocaine that

10  WALKER purchased from BAKER was of poor quality. I believe BAKER told WALKER that he

11  agreed that it was of poor quality, and BAKER told WALKER that he would be exchanging it with

12  his Mexican supplier.

13         **INTERCEPTS: 9 Ounces of Cocaine Base (Oct. 11, 2007)**

14         **(WALKER and WEIR IV)**

15          114.   On October 11, 2007, at approximately 12:20 p.m., WEIR asked WALKER,

16  "Did you hit?" WALKER said, "Nope, you?" WEIR IV said, "I ordered, I ordered . . . he gon' give

17  me, you said I get, I get us a nine for five thousand." WALKER said, "I said five a piece. Nine

18  times five is forty-five." WEIR IV replied, "Well, I'm gon' get him down to forty-five." Based on

19  my training and experience, and my review of hundreds of intercepts in this case, as well as

20  WALKER's usual drug pricing, I believe that WALKER and WEIR IV were discussing the price of

21  9 ounces of crack cocaine. WEIR IV was explaining that he ordered 9 ounces of crack cocaine from

22  a supplier for $5000 (approximately $555 per ounce). WALKER reminded WEIR IV that he had

23  asked for a price of $500 per ounce, for a total of $4500 for 9 ounces, not $5000. WALKER

24  typically sells the crack cocaine for a street price of $600-$650 per ounce, but buys it from his

25  suppliers for considerably less.

26         **SEIZURE: 1 Gram of Methamphetamine (Oct. 12, 2007)**

27          115.   On October 12, 2007, at about 8:07 p.m., WALKER called a drug user named

28  Antrone Jamal Giles, aka "Train," and asked him where he was at. WALKER asked him to come

1  over. Giles said, "I'll come right out." The surveillance team thereafter saw a black male matching

2  Giles' description enter WALKER's apartment complex and later walk out. At 8:43 p.m., an officer

3  saw Giles walking near WALKER's apartment. The officer pulled up beside Giles and asked him if

4  he was on parole or probation. Giles stated, "I'm on probation." The officer asked if Giles had any

5  outstanding warrants, and Giles replied, "Yes. I didn't go to court on the 4th." Based on Giles

6  answer, the officer arrested him. Incident to arrest, the officer found a plastic baggie containing

7  approximately 1 gram of methamphetamine.

8       116.   At about 9:03 p.m., a woman named Selena called WALKER to tell him that

9  "Train just got stopped by the police, he went to jail." She explained what happened. WALKER

10  responded, "Damn, are you sure? Cause he just left my pad just now." At 10:57 p.m., Selena called

11  back to say that "Train" had been booked for possession, because they found drugs on him, and that

12  he had a warrant, too.   WALKER responded, "He should have broke and got rid of that shit and

13  said he ran because of the warrants. . . . Then they would have just booked him for the warrants, you

14  know what I'm saying?" Selena said that it was only one police officer. WALKER then stated,

15  "Yeah, he could have got rid of that, he wasn't supposed to go out like that."

### INTERCEPTS (Oct. 13, 2007)

### (WALKER and RUNNELS)

18       117.   On October 13, 2007, at approximately 10:53 a.m., a woman telephoned

19  WALKER. WALKER gave the woman directions to his apartment complex and told her to call him

20  when she got in the parking lot. The woman said she would "get that same piece, the chicken meal."

21       118.   At approximately 11:23 a.m., the woman telephoned WALKER to "come on

22  out." WALKER asked if she was parked in the same place and what color the car is. The woman

23  said it was a red Honda. WALKER told her that he was sending someone out to her, and described

24  him as a big guy, with a gray shirt and bald head. (RUNNELS is approximately 6 feet, 1 inch tall

25  and 250 pounds, with a bald head.)

26       119.   At approximately 11:26 a.m., agents observed RUNNELS leave WALKER's

27  apartment and return within one minute. RUNNELS was not carrying a chicken meal.

28  //

28

**INTERCEPTS: One-Eighth Ounce of Methamphetamine (Oct. 14, 2007)**

**(WALKER, ALEXANDER AND BAKER )**

120.    On October 14, 2007, at approximately 4:54 p.m., ALEXANDER asked WALKER if there was anything over there at WALKER's apartment.    WALKER told ALEXANDER that he had someone working on it.    At about 7:26 p.m., WALKER called ALEXANDER and told him "it's bad" and he would call him later.

121.    At approximately 8:04 p.m., ALEXANDER called WALKER to ask what was up.  WALKER told ALEXANDER that he has to "cook the food," and then he would be ready for ALEXANDER.  Based on my training and experience, and my review of hundreds of intercepts in this case, I believe WALKER was using code for converting powder to crack cocaine.

122.    ALEXANDER asked if WALKER would call him, and WALKER told him to wait 30 minutes and then come on over to the apartment.    At 9:34 p.m., WALKER told ALEXANDER that "[m]y boy wants to get a baller from you . . . [of] Christina." Based on my training and experience, and my review of hundreds of intercepts in this case, I believe that a "baller" (or eight-ball) of "Christina" refers to an eighth of an ounce of crystal methamphetamine.

123.    WALKER said that he told "my boy" that ALEXANDER was right there at the AM/PM.  WALKER explained that his boy is "J.R." and it would be "a dollar fifty." Based on my training and experience, and my review of hundreds of intercepts in this case, I believe "J.R." refers to Allen Matthew BAKER Jr. and that WALKER was quoting a price of $150 for one-eighth of an ounce of methamphetamine.

**INTERCEPTS: One-Half Ounce of Cocaine Base (Oct. 19, 2007)**

**(WALKER, D. JACKSON and BIBBS)**

124.    On October 19, 2007, at approximately 8:18 a.m., Daphne JACKSON entered WALKER's apartment.  At approximately 9:29 a.m., BIBBS entered WALKER's apartment.

125.    At about 9:34 a.m., WALKER and JACKSON spoke on the telephone. JACKSON said, "One of these are eight, one of these are nineteen point one." WALKER said, "No they're not. . . . Put it back on there, put it on there right." WALKER also asked JACKSON if someone had "come for a quarter last night?" Then JACKSON said, "Here, BIBBS want to talk,

29

1   yep. Okay, hold on."

2   126.   When BIBBS got on the telephone, he told WALKER, "I brought three with

3   me, man." WALKER said, "Three twenty-five, dog." BIBBS said, "I ain't got three twenty-five."

4   WALKER replied, "Well, you bring it next time." BIBBS asked if WALKER would be going "back

5   down to three." WALKER said, "Nope, not yet." BIBBS thereafter said, "Here, tell her. I got three

6   with me now."

7   127.   JACKSON then got on the phone, and WALKER told her, "He's gon' take

8   [unintelligible] . . . twenty-five cent later." Based on my training and experience, and my review of

9   hundreds of intercepts in this case, I believe that WALKER agreed to sell BIBBS a half-ounce of

10  crack cocaine for $325, with BIBBS paying $300 now and $25 later.

11  ## INTERCEPTS (Oct. 19, 2007)

12  ## (WALKER and WEIR V)

13  128.   On October 19, 2007, at about 8:22 p.m., WEIR V called WALKER and

14  stated that he was "tryin' to put this one sixty on the, on the game." WALKER asked, "You trying to

15  see me?" WEIR V said, "Yeah." WALKER replied, "Alright, hey, yeah, be over there in fifteen

16  minutes." Based on my training and experience, and my review of hundreds of intercepts in this

17  case, I believe that WEIR V was asking to purchase $160 of narcotics.

18  ## INTERCEPTS: Methamphetamine (Oct. 20, 2007)

19  ## (WALKER and WEIR IV)

20  129.   On October 20, 2007, at approximately 7:21 p.m., WEIR IV asked WALKER,

21  "Yo, what's a 'tainer of that food supposed to weigh?" WALKER said, "Shit's twenty-five a piece."

22  WEIR IV then asked, "And, and how much the plates go for?" WALKER said, "Shit, six dollars."

23  Based on my training and experience, and my review of hundreds of intercepts in this case, as well as

24  WALKER's usual drug pricing, I believe that WALKER thought WEIR IV was asking for crack

25  cocaine prices. I believe that a "'tainer" (container of food) refers to a "teener" or one-sixteenth of

26  an ounce, and that a "plate" refers to a full ounce. WALKER was quoting a price of $25 for one-

27  sixteenth of an ounce of crack cocaine, and $600 for a full ounce of crack cocaine.

28  130.   WEIR IV then asked some more questions about the price. Finally, WEIR IV

1 said, "I was talkin' about that prostitute girl, Chris . . . that, it's Christina."  WALKER replied, "Oh,

2 oh, oh, you not even . . . wait, let me call you right back, man."  Based on my training and

3 experience, and my review of hundreds of intercepts in this case, I believe that "Chris" or

4 "Christina" refers to crystal methamphetamine, and that WEIR IV had actually been asking for

5 methamphetamine prices, not crack cocaine prices.  WALKER misunderstood WEIR IV's use of the

6 code word "'tainer" a second time, on October 22, 2007 at about 3:29 p.m. (see below).

**INTERCEPTS (Oct. 22, 2007)**

**(WALKER and D. JACKSON)**

9        131.    On October 22, 2007, at about 12:56 p.m., Daphne JACKSON entered

10 WALKER's apartment.

11        132.    At 1:03 p.m., WALKER spoke on the telephone with a person known as

12 "Monkey D."  "Monkey D" asked if he could come through and play some "basketball."  WALKER

13 told him to go ahead.

14        133.    At about 1:11 p.m., JACKSON telephoned WALKER.  During the

15 conversation, WALKER told JACKSON that "Monkey D's on his way over there to, I guess to play

16 some pool with you."  WALKER told JACKSON "that one is uh, a quiz-arter in a, in a ball in the

17 game of pool, quarter in a ball."  WALKER also stated, "It's behind the fridgeniz-erator."

18        134.    Based on my training and experience, and my review of hundreds of intercepts

19 in this case, I believe that "Monkey D" was asking WALKER if he could go by WALKER's

20 apartment to buy narcotics.  WALKER agreed.  WALKER then called JACKSON, who was at

21 WALKER's apartment, and told JACKSON to obtain one-quarter ounce (two-eighths or "8-balls")

22 of narcotics from behind the refrigerator.

**INTERCEPTS: Methamphetamine (Oct. 22, 2007)**

**(WALKER and WEIR IV)**

25        135.    On October 22, 2007, at about 3:29 p.m., WEIR IV asked WALKER, "How

26 much do I charge for half a 'tainer of potato salad?"  WEIR IV repeated the phrase at least four more

27 times, because WALKER did not appear to understand.  WALKER finally said, "I don't know what

28 the fuck you're talkin' about . . . potato . . ."  WEIR IV replied, "Half a 'tainer, man, half a 'tainer,

1  half a 'tainer of Christina." WEIR IV then asked, "One point seven five is what? Half a 'tainer. . ."

2  WALKER said, "That's a whole teener." Based upon my training and experience, and my review of

3  hundreds of intercepts in this case, I believe that "Christina" refers to crystal methamphetamine and

4  a "'tainer" or "teener" refers to one-sixteenth of an ounce (approximately 1.77 grams). WALKER

5  was telling WEIR IV that 1.75 grams is a full teener (one-sixteenth of an ounce), not a half-teener.

6          136.   WEIR IV then said, "A . . . the whole 'tainer? . . . How much is that? . . . How

7  much should I charge?" WALKER replied, "Ninety bucks." WEIR IV asked WALKER if he meant

8  "three" and asked WALKER to repeat the price three times. WEIR IV said, "Three . . . half of eight

9  . . . half of eight ball." WALKER repeated, "Nine zero." WEIR IV again asked, "Three hundred?

10 What?" WALKER repeated, "Nine." Again, WEIR IV asked, "Half of an eight ball, Dog."

11 WALKER repeated, "Nine zero . . . nine, ninety cent." Finally, WEIR IV said, "Oh, that's it? . . .

12 Okay." Based upon my training and experience, and my review of hundreds of intercepts in this

13 case, as well as WALKER's usual drug pricing, I believe that an "8-ball" is an eighth of an ounce

14 and that WALKER was quoting a price of $90 for a "teener" (one-sixteenth of an ounce, or half an

15 "8-ball") of methamphetamine.

16          **INTERCEPTS: Methamphetamine (Oct. 23, 2007)**

17            **(WALKER, ALEXANDER and WILSON)**

18          137.   On October 23, 2007, at approximately 12:21 p.m., WALKER and WILSON

19 spoke on the telephone. WILSON said he needed to get "vital supplies" to his people. WALKER

20 said he would call WILSON right back. Based on my training and experience, and my review of

21 hundreds of intercepts in this case (in particular the intercepts pertaining to WALKER and

22 WILSON's other dealings), I believe that "vital supplies" refers to methamphetamine.

23          138.   At about 12:22 p.m., WALKER telephoned ALEXANDER and said that his

24 "boy" who works at Hewlett Packard and who is "like my brother" was going to be over there and

25 his name is "Craig." WALKER said "one is for you and one is for me," and WALKER instructed

26 ALEXANDER to give him one of WALKER's. WALKER said that Craig would be calling

27 ALEXANDER on an "855 number." (Craig WILSON works at Hewlett Packard and his telephone

28 number is (619) 855-1120.)

139.    At about 12:23 p.m., WALKER telephoned WILSON and said, "Alright, my boy got you. Go on down there. . . . Yeah, call him and he'll meet you wherever . . . 'cause he, he, he is at his pad. He lives right around the corner from me. . . . His name is Melvin." WALKER then recited the number 454-4486. (Melvin ALEXANDER's telephone number is (619) 454-4486.)

140.    At approximately 12:43 p.m., WALKER called WILSON, saying "he" said that WILSON had not called him yet. WILSON assured WALKER that he would call "him" right now. WALKER said he would tell him the meeting place.

**INTERCEPTS: One-Half Ounce of Cocaine Base (Oct. 23, 2007)**

**(WALKER, D. JACKSON, LOCKHART and BIBBS)**

141.    On October 23, 2007, Daphne JACKSON traveled to WALKER's Apartment. At approximately 12:40 p.m., LOCKHART, who was inside WALKER's apartment, opened the front door and let JACKSON inside the apartment. At approximately 1:56 p.m., BIBBS entered WALKER's apartment.

142.    At about 1:56 p.m., BIBBS telephoned WALKER, saying, "I'm at the house, man, can I uh, is three o'clock okay?" WALKER replied, "Huh?" BIBBS said, "Can I get that for three o'clock? Is that okay?" WALKER then said, "Yes."

143.    At approximately 1:57 p.m., WALKER called BIBBS back and asked to speak to JACKSON. JACKSON got on the telephone and told WALKER, "I'm gon' give this to him for three."

144.    Based upon my training and experience, and my review of hundreds of intercepts in this case, as well as WALKER's usual drug pricing, I believe that "three o'clock" and "three" referred to the price of $300, and that WALKER agreed to sell BIBBS half an ounce of crack cocaine for $300, and then confirmed that price with JACKSON.

**INTERCEPTS (Oct. 26, 2007)**

**(WALKER AND ALEXANDER)**

145.    On October 26, 2007, ALEXANDER called to complain that WALKER had shorted him on the narcotics he received. ALEXANDER said, "Hey, you know that whole one you gave me? . . . . You know it wasn't no whole one right?" WALKER said, "Yeah, it was." Based on

33

1  my training and experience, and my review of hundreds of intercepts in this case, I believe a "whole
2  one" refers to a full ounce of narcotics.

3         146.    ALEXANDER replied, "Man, I haven't fucked with nothin' and it's twenty-
4  three with the bag." Based on my training and experience, and my review of hundreds of intercepts
5  in this case, I believe ALEXANDER was stating that the narcotics weighed 23 grams with the bag.
6  A full ounce weighs 28.3 grams, but WALKER typically provides no more than 24 grams of
7  narcotics for a one-ounce purchase.

8         **CONTROLLED PURCHASE: 69 Grams of Cocaine Base (Oct. 27, 2007)**
9                    **(WALKER, CASTILLO and RUNNELS)**

10        147.    On October 27, 2007, CS made a controlled and recorded purchase from
11  WALKER of approximately 69 grams of cocaine base for $1800. CS, who was outfitted with a
12  recorder/transmitter, entered WALKER's apartment and told WALKER that CS wanted to buy two
13  ounces of crack cocaine. WALKER then opened the front door of his apartment, reached into some
14  bushes located directly outside the front door, and obtained a brown paper bag which he brought
15  back into the apartment.

16        148.    WALKER produced what appeared to be crack cocaine from inside the brown
17  bag. WALKER weighed out approximately two ounces and provided it to CS. CS then handed
18  WALKER $1800, and instructed WALKER to count the money. Upon counting the money,
19  WALKER told CS there was too much money. CS then realized that CS paid WALKER for three
20  ounces of crack cocaine, but only received two ounces. CS told WALKER that CS wanted a total of
21  three ounces. WALKER stated he did not have the additional ounce, but placed a call to one of his
22  sources of supply. After the call ended, WALKER told CS that CS would have to wait for the
23  additional ounce.

24        149.    At about 3:00 p.m., WALKER telephoned CASTILLO, aka "Onko", and
25  asked, "Yeah?" CASTILLO replied, "Hey, can you wait thirty minutes? I'm cooking right now."
26  WALKER said, "Hurry, hurry."

27        150.    At about 3:56 p.m., CASTILLO telephoned one of the Target Telephones and
28  RUNNELS picked up the phone. CASTILLO said, "I'm on my way." RUNNELS said, "Huh?"

34

1  CASTILLO said, "Onko."   RUNNELS said, "Hello?   Oh, hold on.   Walky Walk, the ese."

2  WALKER then took the telephone and asked, "Que pasa, amigo?"   CASTILLO repeated, "I'm on

3  my way." WALKER replied, "Hurry up, hurry up."

4           151.   At approximately 4:10 pm, WALKER walked up to CS, who was standing

5  outside the apartment, and provided CS the third "ounce" of crack cocaine.   In total, the crack

6  cocaine had an aggregate weight of approximately 69 grams (2.43 ounces, or 23.0 grams per

7  purported "ounce").

8                        **INTERCEPTS: Cocaine Base (Oct. 27-28, 2007)**

9                             **(WALKER, CASTILLO and BIBBS)**

10          152.   On October 27, 2007, at about 8:24 p.m., BIBBS called WALKER to say,

11  "Hey man, check it out, man.  They've got that taste, man, 'thrax." BIBBS told WALKER that "this

12  stuff tastes nasty as a motherfucker, homie."   WALKER said, "What you want to do, bring it back or

13  what?" BIBBS replied, "Yeah, you got somethin' else." WALKER said, "Nope. . . . It's that bad?"

14  BIBBS replied, "Yeah, it's bad, man, it's woo. . . . Daph [Daphne JACKSON], Daph, Daph tasted

15  it." WALKER said, "Ooh. Let me call these motherfuckers." BIBBS said, "She's the one that told

16  me. . . . I'm sittin' here tastin' it and, and I . . . it's 'thrax.  I wanted to make sure, you know?"

17  WALKER replied, "Alright. . . . Hey, let me call you right back."   Based on my training and

18  experience, and my review of hundreds of intercepts in this case, I believe that "'thrax" or "anthrax"

19  refers to narcotics of poor quality.

20          153.   At approximately 8:26 p.m., WALKER called CASTILLO and said, "That

21  one's no bueno." CASTILLO replied, "No bueno? . . . Why?" WALKER said, "Shit, it's, it's, it's

22  [coughs] it's no good. . . . It's anthrax. . . . Anthrax. . . . That is no good. I don't want that one. Shit,

23  um, you got different?" CASTILLO replied, "Not right now, man." WALKER then said, "Alright,

24  manana, manana, I'm gonna need different." Based on my training and experience, and my review

25  of hundreds of intercepts in this case (in particular, WALKER and CASTILLO's other dealings), I

26  believe that WALKER was requesting new cocaine base from CASTILLO, because he was

27  dissatisfied with the quality of the cocaine base CASTILLO had given him.

28          154.   At about 8:49 p.m., BIBBS called WALKER and asked, "What's up?"

                                         35

1   WALKER explained, "I can't change it 'til tomorrow, so only thing I can do is give you your dough

2   back, dog." BIBBS said, "I'm gon' try to dump it. You want me to try to dump it?" WALKER

3   replied, "Hell, yeah! That's what I'm gon' do. Shit. . . . Nigga, I got four of 'em. I mean, by

4   tomorrow I'm gon' get something different."

5         155.   The next day, on October 28, 2007, at approximately 1:24 p.m., WALKER

6   and BIBBS spoke on the telephone, and BIBBS stated, "I need it. Got somethin' different, right?"

7   WALKER said, "Nah, that's the problem." BIBBS said, "Well, we gotta get rid of that in order to

8   get somethin' different. . . . How much have you got? You want me, um. . . I'm gonna get it, I'm

9   gonna get another one from you, man, I know that, cause it's old, so fuck it. . . . It's sellin', it's

10  sellin', so fuck it."

**INTERCEPTS: 2 Ounces of Cocaine Base (Oct. 28, 2007)**

**(WALKER, CASTILLO and TRYALS)**

13        156.   On October 28, 2007, at approximately 12:56 p.m., WALKER telephoned

14  CASTILLO to ask, "You got, um, two for me?" CASTILLO said, "No . . . . maybe tomorrow."

15        157.   At approximately 3:59 p.m., WALKER telephoned TRYALS and asked, "You

16  just called me?" TRYALS said, "Yeah, how you doin' on your side?" WALKER said, "Shit.

17  Terrible 'til tomorrow." WALKER told TRYALS to "hold me two of those for me when I get off

18  tonight."

19        158.   Based on my training and experience, and my review of hundreds of intercepts

20  in this case (in particular, WALKER and TRYALS' other dealings), I believe that WALKER was

21  trying to obtain 2 ounces of crack cocaine from one of his usual suppliers. Both CASTILLO and

22  TRYALS told him that they did not have any crack cocaine at the moment. WALKER then asked

23  TRYALS to reserve 2 ounces of crack cocaine for him when he got some.

**INTERCEPTS: 4 Ounces of Cocaine Base (Oct. 28, 2007)**

**(WALKER and BAKER)**

26        159.   On October 28, 2007, at approximately 9:45 p.m., WALKER telephoned

27  BAKER and asked, "No good?" BAKER said, "No, not right now, but it'll be good in a minute."

28  WALKER replied, "Shit, nigga, ain't got a minute. . . . We livin' by the seconds now." BAKER

1  replied, "I'll have something good, though." WALKER said, "When you do, hit me immediately."

2  Thereafter, BAKER asked, "Hey, like, like what, though?" WALKER said, "Shit, probably, you

3  know, I don't know, four."

4        160.   Based on my training and experience, and my review of hundreds of intercepts

5  in this case (in particular, WALKER and BAKER's other dealings), I believe that WALKER was

6  attempting to order 4 ounces of crack cocaine from BAKER.  BAKER was saying that he did not

7  have anything for him at the moment, but that he would have some good quality crack cocaine soon.

8  **INTERCEPTS: Cocaine Base (Oct. 29, 2007)**

9  **(WALKER and WEIR V)**

10        161.   On October 29, 2007, at about 2:08 p.m., WEIR V called WALKER to ask

11  "can I come through?" WALKER said, "Shit, I'm not there." WEIR V said, "There ain't nobody

12  there?" WALKER replied, "The only thing I got is some um, Q-tips." WEIR V asked, "Who?"

13  WALKER said, "Q-tips, quarter pound cheeseburgers. . . . Dollar seventy." WALKER said, "My

14  partner there . . . Call me when you get there and tell Tony to call me."  (Bernal Anthony

15  MITCHELL's nickname is "Tony".)

16        162.   Based on my training and experience, and my review of hundreds of intercepts

17  in this case (in particular WALKER and WEIR V's other dealings and WALKER's typical pricing),

18  I believe that the use of the terms "Q-tips" or "quarter pound cheeseburgers" in this conversation

19  refers to one-quarter of an ounce of crack cocaine.  WALKER was telling WEIR V that the current

20  price of a quarter-ounce of crack cocaine is $170.  WALKER typically sells crack cocaine for $600

21  to $650 per ounce, although that price rate generally increases as the quantity being sold decreases.

22  **INTERCEPTS: 4 Ounces of Cocaine Base (Oct. 29-30, 2007)**

23  **(WALKER, RICO and MITCHELL)**

24        163.   On October 29, 2007, at about 7:00 p.m., WALKER telephoned RICO and

25  asked for "cuatro" (Spanish for four).  RICO replied that it was too late and there were too many

26  police.  RICO told WALKER to call him in the morning.

27        164.   On October 30, 2007, at approximately 4:04 p.m., WALKER telephoned

28  RICO, aka "Mija". RICO asked if WALKER wanted "two." WALKER said that he needed "two,"

1 | but that he was at work right now. RICO then said that he wanted to meet at a "different apartment."

2 | WALKER agreed and then said he wanted "cuatro" and that he would call him in an hour.

3 |       165. At about 5:25 p.m., WALKER and RICO spoke again by telephone.

4 | WALKER said, "Hey, Mija. . . . Okay, I got a new address. . . . It's on, you know, on Sixty-second."

5 | (Melvin ALEXANDER's residence is near the intersection of 62nd Street and Stanley Avenue in

6 | San Diego, California.) RICO replied, "Hey, hey . . . no, no, no for four, no good man." RICO then

7 | said, "You, you coming to car wash?" WALKER said, "Okay, okay, um, the car wash. How long?"

8 | RICO said, "How much?" WALKER replied, "You know, cuatro. . . . How long? How long?"

9 | RICO said, "Ten, ten minutes."

10 |       166. At approximately 5:29 p.m., WALKER called MITCHELL to tell him that he

11 | and Daphne JACKSON needed to "come with that dinero and meet me at the car wash on 52nd right

12 | now, at the car wash," and to "hurry up cause they're gonna be there in ten minutes. Look for the

13 | Mexican." (There is a car wash on El Cajon Boulevard in San Diego, near the intersection with

14 | 52nd Street, approximately 10 blocks from Melvin ALEXANDER's residence.)

15 |       167. Based on my training and experience, and my review of hundreds of intercepts

16 | in this case (in particular WALKER and RICO's other dealings), I believe that WALKER and RICO

17 | agreed to meet at a car wash, where RICO would give WALKER 4 ounces of crack cocaine.

18 | **INTERCEPTS: 4 Ounces of Cocaine Base (Oct. 30, 2007)**

19 | **(WALKER and TRYALS)**

20 |       168. On October 30, 2007, at approximately 12:25 p.m., WALKER telephoned

21 | TRYALS and said, "Grab, grab me four. Four sandwiches." TRYALS responded, "I'll call him and

22 | see. Let me go see what time. Let me call and see what time KFC opens."

23 |       169. At about 12:38 p.m., TRYALS called WALKER back and said that "they

24 | unable to complete the call." WALKER replied, "Yeah, that's what was happenin' when I was

25 | callin' his gay ass, too. . . . Damn, well, today if you go to the taco shop, get me four of them, um,

26 | carne asadas." TRYALS said, "If they call . . . if not, if not I'll just uh, hmm, I'll just wait 'til you

27 | get off and then uh, we'll call the other boys."

28 |       170. Based on my training and experience, and my review of hundreds of intercepts

1  in this case, I believe that WALKER's request for four "sandwiches" or four "carne asadas" refers to

2  4 ounces of crack cocaine, and that the "taco shop" in this conversation refers to their Mexican

3  suppliers. TRYALS was saying that if he could not get the narcotics from one supplier, he would try

4  other suppliers.

### OBSERVED PURCHASE: 4 Ounces of Cocaine Base (Nov. 1, 2007)

### (WALKER, RICO and MEDINA)

7      171.   On November 1, 2007, at approximately 6:23 p.m., WALKER telephoned

8  RICO and said, "Cuatro." RICO said that it is ready and "[y]ou wait, you wait one hour."

9  WALKER said, "You call for me . . . . as soon as you get it. Maybe more, cuatro maybe more."

10      172.   At about 7:06 p.m., RICO called WALKER and asked, "You coming to the

11  car wash?" WALKER told RICO, "No, it's no bueno. Come to the Burger King. . . . Burger King

12  right near the Von's. . . You come to the Burger King, right there on El Cajon Boulevard and

13  College. . ." RICO asked, "Are, are you there?" WALKER said, "I'll come there, I'll be there in

14  five minutes. Bring me cuatro." They agreed to meet in five minutes. WALKER warned RICO,

15  "Alright, tell 'em don't have me waitin'. It's not no bueno to be waitin'. I can't wait like I wait at

16  that car wash yesterday, That's no good down there."

17      173.   Based on my training and experience, and my review of hundreds of intercepts

18  in this case (in particular WALKER and RICO's other dealings), I believe that WALKER was

19  ordering 4 ounces of crack cocaine from RICO.

20      174.   Agents set up surveillance at the Burger King and observed the transaction.

21  They saw a Latino male, who is believed to be Felipe MEDINA, arrive in a black Honda. MEDINA

22  then got into WALKER's vehicle, and then left shortly afterwards.

### INTERCEPTS: One-Eighth Ounce of Methamphetamine (Nov. 2, 2007)

### (WALKER and ALEXANDER)

25      175.   On November 2, 2007, at approximately 6:05 p.m., Shay telephoned

26  WALKER and asked if she could come over to talk with "Christina." WALKER told her to come to

27  his apartment. Shay said, "The usual."

28      176.   At approximately 8:30 p.m., WALKER telephoned ALEXANDER and said,

1  "Bowling balls." ALEXANDER replied, "What you want? Two?" WALKER said, "No, one."

2  WALKER told ALEXANDER, "I'm talkin' to my friend Shay. This lady I came with."

3  ALEXANDER asked, "[W]hen is she leaving and I'll be outside. And you . . . you getting the ends

4  then right?" WALKER replied, "No, she gon' give it to you." ALEXANDER said, "You get the

5  ends . . . [a]nd I'll just give her this." Based on my training and experience, and my review of

6  hundreds of intercepts in this case, I believe that the term "the ends" refers to money or payment,

7  "Christina" refers to crystal methamphetamine and a "bowling ball" refers to an eighth of an ounce

8  or "8-ball.".

9          177.   WALKER said "this is what you owe me, so we just be even."

10  ALEXANDER said, "I don't know what you charge for yours." WALKER replied, "A dollar fifty."

11  ALEXANDER said, "Well, you need to add like about a dollar, about twenty-five cents." Based on

12  my training and experience, and my review of hundreds of intercepts in this case, I believe that

13  ALEXANDER owed WALKER money, so the two agreed that WALKER could accept payment

14  from Shay, and then ALEXANDER would provide her the methamphetamine without payment.

15          178.   WALKER told ALEXANDER that she (Shay) would be driving a gold, four-

16  door Lexus and would be there in four minutes.

17          179.   At approximately 8:35 p.m., agents observed a gold, four-door Lexus,

18  registered to Shay, arrive in front of ALEXANDER's residence at **6225 Stanley Avenue, Apt. 1,**

19  **San Diego, California ("ALEXANDER's apartment")**. They observed ALEXANDER walk up to

20  the white female who was driving the Lexus and then depart shortly thereafter.

21          **OBSERVED PURCHASE: 5 Ounces of Cocaine Base (Nov. 2, 2007)**

22                  **(WALKER and CASTILLO)**

23          180.   On November 2, 2007, at approximately 5:52 p.m., WALKER spoke with

24  CASTILLO on the telephone. WALKER asked, "You got five for me?" CASTILLO answered, "I

25  got nine for you." WALKER said, "Nine? Alright, hold it. . . . I gotta go get a thousand dollars. I

26  gotta, I, I want it. I want it. I get the money." CASTILLO asked again, "Nine?" WALKER

27  confirmed, "Nine, nueve." CASTILLO said he would be "ready maybe at six thirty, I'm a ready."

28          181.   At about 8:20 p.m., WALKER telephoned CASTILLO. WALKER stated, "I

40

1  only got for five, cinco." CASTILLO asked, "Five?" WALKER confirmed the amount, and said,

2  "Alright, come on." CASTILLO replied, "Alright, I'll be there in ten minutes." WALKER said,

3  "Okay, I'm here." Based on my training and experience, and my review of hundreds of intercepts in

4  this case (in particular WALKER and CASTILLO's other dealings), I believe that WALKER

5  initially tried to order 9 ounces of cocaine base from CASTILLO, but later stated he only had enough

6  money for 5 ounces of cocaine base.

7        182.    At about 9:00 p.m., a blue Dodge pickup with two Latino males arrived at

8  WALKER's apartment complex.  At least one of the Latino males (believed to be CASTILLO)

9  entered the apartment complex, and soon returned to the pickup.  The pickup then drove to the

10  apartment complex where CASTILLO's Nissan Armada is usually parked (and CASTILLO is

11  believed to live), arriving at about 9:35 p.m.  One of the Latino males got out of the pickup truck,

12  went up to the third floor of the apartment complex, returned to the ground level, and drove off in

13  CASTILLO's Nissan Armada.

14                    **INTERCEPTS: Cocaine Base (Nov. 4, 2007)**

15                      **(WALKER, ALEXANDER and TRYALS)**

16        183.    On November 4, 2007, at approximately 12:21 p.m., TRYALS telephoned

17  WALKER and said, "I'm over there, he ain't got what I, what I need." WALKER asked, "'Tina?"

18  TRYALS said, "No, what I always get." WALKER replied, "Siete?" TRYALS confirmed, "Yeah."

19  Based on my training and experience, and my review of hundreds of intercepts in this case (in

20  particular WALKER and TRYALS' other dealings), I believe that "'Tina" refers to "Christina" or

21  crystal methamphetamine and "what I always get" means crack cocaine. TRYALS was stating that

22  he did not want methamphetamine, but he wanted crack cocaine.

23        184.    WALKER replied, "Let, let me talk to him." ALEXANDER then got on the

24  telephone, and WALKER asked, "You ain't got that for him?" ALEXANDER said that he was

25  almost ready, but he said, "All I had was um, was um, was a ball. Baseball." WALKER said, "Uh,

26  shit. Fuck. Alright, let me talk back with him." TRYALS then got on the telephone again, and

27  WALKER said, "I'm gonna have the boy bring it.  When he does, I'm gonna leave it here with Daph

28  [Daphne JACKSON] and she'll call you, I'll call you when she gots it." Based on my training and

                                    41

1  experience, and my review of hundreds of intercepts in this case, I believe that "ball" or "baseball"

2  refers to an eighth of an ounce (or "8-ball") of narcotics.

3        **INTERCEPTS: Storing of Narcotics at ALEXANDER's Apartment (Nov. 5, 2007)**

4                    **(WALKER and ALEXANDER)**

5       185.   On November 5, 2007, at approximately 10:14 a.m., WALKER and

6  ALEXANDER spoke on the telephone about a female who may have stolen either money or

7  narcotics from ALEXANDER the previous day. ALEXANDER told WALKER that he was out

8  looking for her the previous night, but was unable to locate her. WALKER told him not to put all

9  his energy into trying to find her, and told ALEXANDER that when he does find her, he needs to

10  take care of his business. ALEXANDER told WALKER that because of the problem with the

11  female, ALEXANDER would have to keep just "a little bit" in his house. ALEXANDER added that

12  he would still get what he normally gets from WALKER, but he would keep just a little bit at his

13  house because he was worried the female might tell on him. Based on my training and experience,

14  and my review of hundreds of intercepts in this case, I believe that "a little bit" refers to a small

15  amount of narcotics. I believe that ALEXANDER was saying that he would continue to obtain the

16  same amount of narcotics from WALKER, but that he would be keeping less of it at his residence,

17  because he was afraid the female might report him to the police.

18             **INTERCEPTS: 32 Grams of Cocaine Base (Nov. 5, 2007)**

19            **(WALKER, LOCKHART and G. JACKSON)**

20       186.   On November 5, 2007, at approximately 3:23 p.m., LOCKHART, aka "Blue",

21  entered WALKER's apartment. At approximately 5:27 p.m., WALKER and LOCKHART spoke on

22  the telephone. LOCKHART said that "Miss G. outside in the living room." (Gloria JACKSON's

23  nickname is "Miss G.") WALKER replied, "It's behind the 'frigerator, Blue. It's . . . thirty-two. It's

24  thirty-two, just give her twi-zelve."

25       187.   At approximately 5:39 p.m., LOCKHART called WALKER back, asking,

26  "Fifteen with three minutes was what she, um, supposed to shoot?" WALKER first said "three,"

27  then "325." LOCKHART said that Gloria JACKSON had "315." Later in that same call,

28  LOCKHART told WALKER that someone else had paid "350" earlier that day.

1    188.    Based on my training and experience, and my review of hundreds of intercepts

2    in this case, as well as WALKER's usual drug pricing, I believe that WALKER was telling

3    LOCKHART that he had 32 grams of crack cocaine hidden behind the refrigerator, and that

4    WALKER wanted LOCKHART to give 12 grams (about a half-ounce) to Gloria JACKSON.    I

5    believe that "fifteen with three minutes," "three" and the other numbers mentioned above refer to

6    prices for half an ounce of crack cocaine (varying between $300 and $350).    At this time, WALKER

7    normally charged about $325 for a half-ounce of crack cocaine, and WALKER typically provided no

8    more than 12 grams (0.42 ounces) for a half-ounce purchase.

9    **INTERCEPTS: One-Half Ounce of Crack Cocaine (Nov. 6, 2007)**

10    **(WALKER and WEIR V)**

11    189.    On November 6, 2007, at approximately 3:44 p.m., WEIR V called WALKER

12    to ask, "Hello, what up, what up?"    WALKER said, "Three dollar twenty-fives cents, son.    Three

13    dollar and twenty-five cents for the roll of tacos."    WEIR V asked, "Hey, do you got the yellow

14    cheese?"    WALKER said, "Nope.    I don't know. . . . I ain't even looked at it."    WEIR V said, "Look

15    at it and call me right back."    Then WALKER explained, "I'm not there, so I got someone there."

16    WEIR V said, "Okay."    Based on my training and experience, and my review of hundreds of

17    intercepts in this case (in particular WALKER and WEIR V's other dealings), as well as

18    WALKER's usual drug pricing, I believe that WALKER was quoting a price of $325 for a half-

19    ounce of crack cocaine.

20    **INTERCEPTS: Quarter-Pound of Marijuana (Nov. 9, 2007)**

21    **(WALKER and ARMSTRONG)**

22    190.    On November 9, 2007, at approximately 4:56 p.m., WALKER telephoned

23    ARMSTRONG and asked, "Can I get a QP?"    ARMSTRONG said WALKER would have to wait

24    until she got off work at 8:00 p.m.    WALKER asked if ARMSTRONG was going to get it from

25    "Van Dyke Mike or are you goin' to Craig."    (Both "Van Dyke Mike" and Craig Mack are suspected

26    suppliers of marijuana and crack cocaine.)    ARMSTRONG said, "Either one, it don't matter.    They

27    both got the same thing."    WALKER said, "I'm probably gon' get the whole thing."    ARMSTRONG

28    said, "Okay, just call me and let me know."

1       191.   At about 7:59 p.m., ARMSTRONG called WALKER and asked, "Did you

2 ever call that dude?" WALKER said, "No." ARMSTRONG said, "I'm just now gettin' off work.

3 I'm in my car right now." WALKER asked, "What you got?" ARMSTRONG asked, "What do you

4 mean? Fruit flies?" WALKER replied, "Yeah." ARMSTRONG said, "I . . . nothin', I'm 'bout to

5 get me somethin' in a minute, so . . . why, what do you want?" WALKER said, "Um, a QP."

6 ARMSTRONG replied, "So that mean I'll have to get it twice. [She then sighed.] So, you want me to

7 get you one and then come get the money and then come back and get my own?" WALKER said,

8 "Yeah."

9       192.   Based on my training and experience, and my review of hundreds of intercepts

10 in this case (in particular WALKER and ARMSTRONG's other dealings), I believe that the use here

11 of the term "QP" (or "quarter pounder") or "Q" refers to a quarter-pound of marijuana, and that the

12 term "fruit" or "fruit flies" (like similar references to fruits or vegetables) refers to marijuana. I

13 believe that ARMSTRONG intended to buy a quarter-pound of marijuana for WALKER and a

14 quarter-pound of marijuana for her own drug-dealing. However, since ARMSTRONG did not have

15 enough money to buy a full half-pound of marijuana, she would need to deliver WALKER's quarter-

16 pound first, receive payment from him, and then buy her own quarter-pound of marijuana.

17       193.   Later that night, agents followed ARMSTRONG to Craig Mack's residence.

18 Someone believed to be Craig Mack came out of the residence and met with ARMSTRONG at her

19 vehicle. At approximately 9:17 p.m., ARMSTRONG called WALKER and said, "Um, I already got

20 it, but, I, I'm gon' have to go get me some more, 'cause I ain't have all the money to get just the

21 whole half." WALKER asked, "What you got?" ARMSTRONG said, "I got the Q like you asked."

22 WALKER said, "I'll be at my pad in thirty minutes." ARMSTRONG told WALKER to call her if

23 he was not there in 30 minutes, "because a lot of people be waitin' on me and I can't do nothin'

24 'cause I'm tryin' to get this to you." WALKER assured ARMSTRONG he would not keep her

25 "ridin'" like that. ARMSTRONG said, "No, I'm not gon' ride like this at all, but I'm just sayin'.

26 I'm . . . . gon', I'm gon' put it in safe and my safe ain't in the car."

27 //

28 //

**INTERCEPTS: 2 Ounces of Cocaine Base (Nov. 9, 2007)**

**(WALKER, MITCHELL and TRYALS)**

194.    On November 9, 2007, at approximately 6:24 p.m., WALKER telephoned TRYALS, aka "Texas Mike", to inform TRYALS that "I'm just gon' give you two of mine.  You can give 'em back to me tomorrow."

195.    At approximately 9:00 p.m., TRYALS called WALKER back.  WALKER said that he was not at home, but that TRYALS should go there and hand one of them the phone.  At approximately 11:06 p.m., MITCHELL telephoned WALKER and asked, "Yeah, what you want me to do with that?"  WALKER replied, "You give him two?"  MITCHELL asked, "Give who two?"  WALKER said, "Mike. Texas."  MITCHELL responded, "No, this is . . . this . . . okay, he's here.  Alright, I didn't know.  Here you go, Mike."

196.    Based on my training and experience, and my review of hundreds of intercepts in this case (in particular WALKER and TRYALS' other dealings), I believe that the "two" refers to 2 ounces of cocaine base.

**SEIZURE: 119.68 Grams of Cocaine Base (Nov. 10, 2007)**

**(WALKER, RICO and MEDINA)**

197.    On November 10, 2007, agents arrested Felipe MEDINA with 119.68 grams (approximately 4.2 ounces) of crack cocaine, which he was on his way to deliver to WALKER.  At 4:03 p.m., WALKER called RICO and said, "cuatro, amigo" [Spanish for "four, friend"].  RICO responded, "Uh, twenty minutes, no problem.  Twenty, twenty-five, you know?"  At 5:02 p.m., WALKER called again, asking, "What . . . you ready?"  RICO said, "Fifteen . . . ten minutes, fifteen minutes."  WALKER responded, "Alright, I'll be over there."  Based on my training and experience, and my review of hundreds of intercepts in this case (in particular WALKER and RICO's other dealings), I believe that by saying "cuatro," WALKER was ordering 4 ounces of crack cocaine.

198.    At 5:10 p.m., an agent stationed at 4162 Estrella Avenue (the origin of RICO's load vehicles) observed RICO's black Honda Accord leaving the 4100 block of Estrella Avenue and heading toward WALKER's apartment.    Officers performed a traffic stop and determined that the driver, Felipe MEDINA, was an illegal alien.  They found 95.80 grams (3.38

45

1 | ounces) of cocaine base in a hidden compartment in the vehicle, and 23.88 grams (0.84 ounces) of
2 | cocaine base on MEDINA's person, for a total of approximately 119.68 grams (4.2 ounces) of
3 | cocaine base.

4 |     199.    At 6:26 p.m., WALKER called RICO, and RICO said, "Lee, I'm sorry man,
5 | the, the, my, my friend is, is, going to the police . . . . [I]t's no problem, man . . . it, it's my stuff is
6 | right now is at my brother's." WALKER responded, "Well, I'll do it . . . we'll do it first thing in the
7 | morning."

8 | **INTERCEPTS (Nov. 11, 2007)**
9 | **(WALKER and RUNNELS)**

10 |     200.    On November 11, 2007, at about 2:55 p.m., RUNNELS spoke to WALKER to
11 | say "your neighbor Joe is here." WALKER ordered him to "grab that" and to "put him on."
12 | WALKER told Joe "just leave it with them and tell 'em I said to hide it up in my room." Then
13 | RUNNELS got back on the phone, and WALKER told him, "Wi-zeigh it out, wi-zeigh it out real
14 | quick and call me back. . . . Just weigh it out and tell me what it is with the bi-zaggie."

15 |     201.    At about 2:58 p.m., they spoke again by telephone. WALKER asked, "What
16 | it weigh?" RUNNELS replied, "Six-eight. . . . six-eight and you get twenty bucks back." WALKER
17 | asked, "With the bag? Six-eight with the bag?" RUNNELS answered, "Huh? Without the bag. . . .
18 | It was supposed to be seven, but it's six-eight, without the bag."

19 |     202.    Based on my training and experience, and my review of hundreds of intercepts
20 | in this case, I believe that the term "six-eight" refers to 6.8 grams (approximately 0.24 ounces). A
21 | full quarter-ounce weighs approximately 7.087 grams. I believe that the person named Joe was
22 | supposed to deliver a quarter-ounce of narcotics to WALKER's apartment, and that WALKER was
23 | asking RUNNELS to weigh the narcotics for him. RUNNELS informed WALKER that Joe had not
24 | brought the full amount of narcotics, but that WALKER would receive $20 back.

25 | **INTERCEPTS: Currency and Sales (Nov. 11, 2007)**
26 | **(WALKER and D. JACKSON)**

27 |     203.    On November 11, 2007, at about 3:37 p.m., WALKER called Daphne
28 | JACKSON to discuss several sales. WALKER asked if "Kim" got a "half." JACKSON said, no,

46

1  that she got a quarter instead. WALKER told her to keep the money separated and put it in one of

2  his shoes. WALKER told JACKSON about prices and to "keep the money separated from the first

3  and second half." JACKSON said, "I know, I know how to do that." WALKER replied, "Well, act

4  like it. Cause you always fuckin' up, alright?"

## INTERCEPTS (Nov. 13, 2007)

### (WALKER, D. JACKSON and G. JACKSON)

7  204.    On November 13, 2007, at about 7:12 p.m., Daphne JACKSON telephoned

8  Gloria JACKSON to ask if she was coming. Daphne JACKSON said she was. Daphne JACKSON

9  informed her that somebody else wanted some and he only had a little. Gloria JACKSON asked if

10  Daphne JACKSON had "one" for her. Daphne JACKSON replied, "Right now." Gloria JACKSON

11  then said, "Okay." Agents thereafter observed Gloria JACKSON arrive at WALKER's apartment

12  complex, and shortly thereafter they observed her re-enter her vehicle and drive away. Based on my

13  training and experience, and my review of hundreds of intercepts in this case, I believe that Gloria

14  JACKSON was picking up narcotics from WALKER's apartment.

## INTERCEPTS: Half-Ounce of Crack Cocaine (Nov. 16, 2007)

### (WALKER, MITCHELL and G. JACKSON)

17  205.    On November 16, 2007, WALKER spoke to Gloria JACKSON on the

18  telephone. Gloria JACKSON said that she had just left his place. She complained that "Tony" was

19  not there and someone else had answered the door. (Bernal Anthony MITCHELL's nickname is

20  "Tony".) WALKER then called back to his apartment and told the person who answered to wake

21  "Tony" up. Soon thereafter MITCHELL got on the phone, and WALKER told him to "get one and

22  cut it in half and give her . . . give her half and she going give you three dollars and fifteen cent."

23  MITCHELL said he would give her "twelve point one." WALKER replied, "Twelve zero. Thirteen

24  with the bag. Thirteen."

25  206.    Based on my training and experience, and my review of hundreds of intercepts

26  in this case, I believe that WALKER was telling MITCHELL to sell Gloria JACKSON a half-ounce

27  of crack cocaine for $315. Specifically, WALKER wanted MITCHELL to provide her 12.0 grams of

28  crack cocaine (13 grams including the plastic bag). Although a full half-ounce would weigh about

47

1    14.17 grams, WALKER typically provided no more than 12.0 grams of narcotics for a half-ounce

2    purchase.

### INTERCEPTS: 5 Ounces of Cocaine Base (Nov. 16-17, 2007)

### (WALKER, RICO and ALEXANDER)

5    207.    On November 16, 2007, at approximately 3:41 p.m., WALKER telephoned

6    RICO and said he was going to need "cinco in the morning." ("Cinco" is the Spanish word for five.)

7    RICO said that "in the morning its ready for you." WALKER agreed to call him between 8:00 and

8    9:00 the next morning. Based on my training and experience, and my review of hundreds of

9    intercepts in this case (in particular WALKER and RICO's other dealings), I believe that WALKER

10    was ordering 5 ounces of crack cocaine.

11    208.    On November 17, 2007, at approximately 8:00 a.m., WALKER called RICO

12    and said, "What's up, cinco." RICO said, "Huh?" WALKER again said, "Cinco." RICO said it

13    would be ready in 40 minutes.

14    209.    At approximately 9:09 a.m., WALKER and RICO spoke by telephone and

15    agreed to meet at ALEXANDER's apartment. WALKER then traveled to ALEXANDER's

16    apartment complex, arriving at approximately 9:15 a.m. At about 9:19 a.m., RICO telephoned

17    WALKER and asked, "Hey, how long you come?" WALKER said, "I'm here." RICO then said,

18    "Okay, me, me, one minute in line. . . . Two minutes." At approximately 9:25 a.m., RICO arrived at

19    ALEXANDER's apartment complex in a separate vehicle.

20    210.    At approximately 9:25 a.m., WALKER telephoned ALEXANDER to see if he

21    was home. ALEXANDER told WALKER he could come by, and WALKER said he was coming

22    now. WALKER and RICO both walked into ALEXANDER's apartment complex. At

23    approximately 9:30 a.m., WALKER and RICO left the apartment complex and departed in their

24    separate vehicles.

### SEIZURE: 5.91 Grams of Cocaine Base (Nov. 19, 2007)

26    211.    On November 19, 2007, at about 9:10 p.m., Robert Clark Myers, who has

27    frequently obtained crack cocaine from WALKER, called WALKER to see if he could come by the

28    apartment. WALKER responded, "Come on." Shortly thereafter, agents observed a black male,

1 | who matched the description of Myers, enter WALKER's apartment and leave a short time later.

2 | They observed him get into a car and drive toward El Cajon Boulevard. One of the car's brake lights

3 | was out and the car's registration was expired. An officer performed a traffic stop and later arrested

4 | Myers for being under the influence of a controlled substance. During a strip search at the station,

5 | officers recovered from Myers' buttocks a plastic baggie containing approximately 5.91 grams

6 | (0.21 ounces) of cocaine base.

7 | **Continued Drug Trafficking Activity (Nov. 20, 2007—Jan. 15, 2007)**

8 | 212. The last day of Court-authorized wire interceptions in this case was

9 | November 19, 2007. After the conclusion of the intercepts, agents and officers assigned to the

10 | investigation continued to conduct surveillance at both WALKER's apartment and ALEXANDER's

11 | apartment, among other places. Foot traffic consistent with previously observed narcotic activities

12 | has continued at both locations.

13 | 213. In addition, on December 12, 2007, a CI purchased narcotics from a facilitator

14 | on the street in front of BIBBS' apartment complex. SDPD officers observed the facilitator walk

15 | into BIBBS' apartment, and then return to the CI with narcotics. Similarly, on December 17, 2007,

16 | the SDPD arrested ALEXANDER in front of his apartment complex for possession of cocaine base

17 | for sale, among other charges, when he fled from police and tossed away bags found to contain crack

18 | cocaine and methamphetamine.

19 | 214. Further evidence of ongoing drug-trafficking activity following the cessation

20 | of wire interceptions is addressed individually for each co-conspirator in Section E, above.

21 | G.     **KNOWN EVIDENCE OF DOMINION AND CONTROL**

22 | 215. The evidence of dominion and control for the individual and location

23 | specified in Attachment A is as follows for each of the locations to be searched:

24 | 216. **Lee Vaughn WALKER, aka "Lee Dog", and Virginia Hughes; 7410**

25 | **Cuvier Street Apartment 4, La Jolla, California:** This address is listed as the address for Lee

26 | Vaughn WALKER, aka "Lee Dog", as well as his mother, Virginia Hughes, according to subscriber

27 | information provided by Sprint, Cingular and AT&T, the telephone companies used by both

28 | WALKER and Hughes. Hughes has both a cellular telephone and a hardline in her name at the

1  above address. Additionally, this address is the address on file for WALKER as his residence with

2  WALKER's parole officer. WALKER's parole officer has made numerous visits to this residence

3  for monthly parole checks for WALKER. Additionally, this is the address on file with the

4  Department of Motor Vehicles for both WALKER and Hughes.

5  217. **Gloria JACKSON; 7163 Central Avenue, Lemon Grove, California:** This

6  free-standing house (which is associated with, but physically separate from, a 6-unit apartment

7  building behind it) is listed as the address for Gloria JACKSON, according to subscriber information

8  provided by AT&T for the hardline used by JACKSON to contact WALKER. On or about

9  November 13, 2007, law enforcement officers observed JACKSON driving a Nissan 350Z from

10 WALKER's apartment (the Rolando Court address). According to the California Department of

11 Motor Vehicles, the vehicle is registered to JACKSON at this address. On December 18 and 19,

12 2007, FBI Special Agent William Sexton observed the Nissan parked directly in front of this

13 address. On January 7, 2008, officers observed JACKSON parked outside this residence in her

14 vehicle.

15 218. **Alexander WEIR V, aka "Lil' Brick"; 9928 Buena Vista, Spring Valley,**

16 **California:** WEIR V's residence is an apartment in a multi-unit apartment building that contains

17 even-numbered apartments 9922-9934. On or about December 24, 2007, Special Agent Dennis

18 Hodges, California Department of Corrections, Special Services Unit, spoke with a resident in an

19 adjacent apartment who confirmed that WEIR V resides in Apartment 9928. Additionally, Special

20 Agent Hodges identified the vehicle used by WEIR V at the multi-unit apartment complex on several

21 occasions, with the latest being December 26, 2007. As recently as January 9, 2008, agents observed

22 WEIR V entering and exiting Apartment 9928.

23 219. **Melvin ALEXANDER; 6225 Stanley Avenue, Apartment 1, San Diego,**

24 **California:** This residence is listed as the address for Melvin ALEXANDER according to

25 subscriber information provided by Sprint, the telephone company used by ALEXANDER.

26 Additionally, this is the most current address on file with the Department of Motor Vehicles for

27 ALEXANDER. On December 17, 2007, ALEXANDER was arrested at this address by the SDPD

28 for possession of cocaine base for sale. On numerous occasions, ALEXANDER has been observed

1    by law enforcement personnel at this address.

2            220.    **Lee Vaughn WALKER, aka "Lee Dog", and Bernal Anthony**

3    **MITCHELL, aka "Tony"; 4881 Rolando Court, Apartment 69, San Diego, California:**    This

4    residence is used as a narcotics distribution location by Lee Vaughn WALKER, aka "Lee Dog".

5    Special Agent Robert A. Harris has been in contact with the apartment complex management since

6    February 2007, and the management has provided information on the suspected narcotic activities

7    inside this residence.  According to the apartment complex management, a female name is listed as

8    the tenant of Apartment 69, but the management has never seen this woman at the apartment and

9    believes the woman does not reside there.  Since September 2007, a pole camera has been capturing

10   images of WALKER and his criminal associates entering and departing this residence at will.

11   Additionally, a confidential source ("CS") has been inside this residence on numerous occasions

12   conversing with WALKER and his criminal associates.  Between March and October 2007, CS

13   participated in approximately six controlled narcotic purchases from WALKER from this address.

14   In addition, from September to November 2007, agents obtained Court-authorized wire interceptions

15   of WALKER's telephones, which confirmed on dozens of occasions that narcotics were being

16   distributed from this apartment and that MITCHELL lives there and WALKER resides there

17   periodically.

18           221.    **Eleodoro CASTILLO, aka "Onko"; 4770 Home Avenue, Apartment 301,**

19   **San Diego, California:**    This residence was tied to Eleodoro CASTILLO, aka "Onko", through

20   surveillance by law enforcement officers on several occasions when a Nissan Armada driven by

21   CASTILLO departed the Rolando Court address after supplying WALKER with crack cocaine.

22   According to subscriber information provided by Sprint, CASTILLO was listed not as the subscriber,

23   but as the user, of one of the phones used to contact WALKER.  The other two phones on which

24   WALKER contacted or attempted to contact CASTILLO were subscribed in a female's name, but

25   the address on file with the telephone companies for those two phones identified this address.  On or

26   about November 1, 2007, a traffic stop was conducted on the Nissan Armada by the SDPD, and the

27   driver provided Mexican identification as CASTILLO.  On December 14, 2007, law enforcement

28   officers spoke with two of the three known adult occupants at this residence, and one of the females

1  provided information that her husband's name was CASTILLO.  On December 13, 2007, the United

2  States Post Office confirmed CASTILLO receives mail at this address.

3          222.  **Jose Galvan RICO, aka "Mija"; 3670 Highland Avenue, San Diego,**

4  **California:** Agents have continued to observe RICO exiting this free-standing house, including a

5  sighting as recently as January 3, 2008.  Additionally, this is the address on file with the California

6  Department of Motor Vehicles for RICO.

7          223.  **Melvin Andre BIBBS; 4068 44th Street, Apartment 104, San Diego,**

8  **California:**  The residence is listed as the address for Melvin Andre BIBBS according to subscriber

9  information provided by Cricket, the telephone company used by BIBBS; however, the apartment

10  number was not provided to Cricket.  In December 2006, BIBBS was involved in an automobile

11  accident, and he provided this address (including the apartment number) as his residence to the

12  insurance company handling the claim.  The SDPD recently began receiving complaints about

13  narcotics being sold by a "Melvin" at Apartment 104.  On December 12, 2007, the SDPD

14  successfully conducted a controlled crack cocaine purchase from this apartment.

15          224.  **Keiko Thomas and Michael Dwayne TRYALS, aka "Texas Mike", aka**

16  **Michael Tryls, aka Dave Brooks, aka Leon Howard Blair, aka Earl David Hollis; 4147 43rd**

17  **Street, Apartment A, San Diego, California:** Apartment A (which is the ground-floor unit in a

18  two-story building, with Apartment B upstairs) is listed as the address on file with the California

19  Department of Motor Vehicles for Keiko Thomas, believed to be the girlfriend of TRYALS.  On

20  December 4, 2007, the SDPD conducted a traffic stop on a Toyota Tacoma registered and driven by

21  TRYALS.  Thomas was in the vehicle at the time.  On December 13, 2007, law enforcement officers

22  observed the Tacoma and a Toyota Tercel parked at this address.  On December 17, 2007, law

23  enforcement officers observed TRYALS driving the Tercel to and from this address. One of the

24  telephones used by TRYALS to contact WALKER was subscribed to by Thomas.  According to Cox

25  TelCom, the service provider for that telephone, the telephone used by TRYALS to speak with

26  WALKER, is a hardline at this residence, and is subscribed to by Thomas.

27          225.  **Alexander WEIR IV, aka "Brick"; 745 42nd Street, San Diego,**

28  **California:**  This single-family residence (free-standing house) is listed as the address on file with

1    the California Department of Motor Vehicles for Alexander WEIR IV, aka "Brick". Additionally,

2    the vehicle in which WEIR IV has been seen driving is registered in his name at this address. The

3    SDPD has seen this vehicle at this residence on several occasions, with the most recent being on

4    December 27, 2007. During the period of wire interceptions, WEIR IV told WALKER the number

5    he was calling from was his home number. The number identified is a hardline at this address.

6            226.   **Niesha Shawnee ARMSTRONG, aka Niesha S. Jackson; 4172 Yale**

7    **Avenue, La Mesa, California:** ARMSTRONG's residence at 4172 Yale Avenue in La Mesa,

8    California, is an apartment located in a multi-unit apartment building which contains even-numbered

9    units 4170-4184. On December 31, 2007, ARMSTRONG renewed her vehicle registration and

10   listed this apartment (Apartment 4172) as her residence. On January 9, 2008, agents observed

11   WALKER leave this apartment building and thereafter observed ARMSTRONG also leave the

12   apartment building. On or about January 10, 2008, an agent saw the lights go off in Apartment 4172

13   and then observed ARMSTRONG exit the apartment.

14       **H.    SEALING REQUEST**

15           227.   Because this is an ongoing investigation and premature disclosure of the

16   investigation and this affidavit could endanger agents and officers, cause suspects to flee, and cause

17   the destruction of evidence, I request that this affidavit, all search warrants, all arrest warrants, the

18   complaint, and all other associated court records be sealed until further court order.

19       **I.    CONCLUSION**

20           228.   Based on the facts summarized above, and my ongoing participation in this

21   investigation, your affiant believes that the individual listed in Attachment A is involved in drug

22   trafficking activities related to the sale of marijuana, cocaine base, and/or methamphetamine, and

23   that agents are likely to find narcotics, documentation and proceeds from these activities at the

24   residence listed in Attachment A.

25           229.   Based on the foregoing, your affiant believes that probable cause exists that

26   the residence listed in Attachment A (the location to be searched) contains property that constitutes

27   evidence of the commission of an offense under Title 21, United States Code, Sections 841(a)(1) and

28   846 and Title 18, United States Code, Sections 2 and 1956(h); contraband and fruits of such

1  offenses; and property designed and intended for use and which had been used as the means of

2  committing such offenses.  Such property is more particularly described in Attachment B to this

3  affidavit.

4        230.  Wherefore, your affiant respectfully requests that a search warrant be issued

5  for the residence listed in Attachment A, authorizing a search of the premises and the seizure of the

6  items described with particularity in Attachment B to the Application and Affidavit for Search

7  Warrant.

8        231.  WHEREFORE, I respectfully request that the Court issue (1) arrest warrants

9  for Lee Vaughn WALKER, aka "Lee Dog", Melvin ALEXANDER, Jose Galvan RICO, aka "Mija",

10  Eleodoro CASTILLO, aka "Onko", Daphne Rosalinda JACKSON, aka Daphne R. Rae, Bernal

11  Anthony MITCHELL, aka "Tony", Allen Matthew BAKER Jr., aka "J.R.", aka Tracy Reyard Diggs,

12  aka Marcus Johnson, Michael Dwayne TRYALS, aka "Texas Mike", aka Michael Tryls, aka Dave

13  Brooks, aka Leon Howard Blair, aka Earl David Hollis, Bobby Shawn LOCKHART, aka "Blue",

14  Alexander WEIR IV, aka "Brick", Alexander WEIR V, aka "Lil' Brick", Felipe MEDINA, Melvin

15  Andre BIBBS, and Mark Edward RUNNELS, aka "Marky Mark"; and (2) search warrants for the

16  locations described in section B above (and more particularly described in Attachment A) to seize

17  the items in Attachment B of each of the applicable applications.

18

19

20  ROBERT A. HARRIS
    Special Agent
21  Federal Bureau of Investigation

22

23  SUBSCRIBED and SWORN to before me

24  on this 15th day of January, 2008.

25

26

27  Hon. NITA L. STORMES
    United States Magistrate Judge

28